*374
 
 PER CURIAM.
 
 [1]
 

 liThe state charged defendant in a two-count bill of information with second degree cruelty to juveniles, in violation of La.R.S. 14:93.2.3, and with cruelty to juveniles, in violation of La.R.S. 14:93. After trial by jury, defendant was found guilty of attempted second degree cruelty to juveniles and guilty as charged of cruelty to juveniles. The trial court sentenced him to consecutive terms of 10 years imprisonment at hard labor. On appeal, the Third Circuit reversed defendant’s conviction for attempted second degree cruelty to juveniles on grounds that the state failed to present evidence sufficient to support that verdict or a verdict for any other possible lesser and included offense.
 
 State v. Strother,
 
 09-0110 (La.App. 3rd Cir.10/7/09), 19 So.3d 598 (Amy, J., concurring in part and dissenting in part). As to that count, the court of appeal ordered defendant | ¡.acquitted. With regard to the second count, the Third Circuit panel affirmed defendant’s conviction for cruelty to juveniles. However, the Third Circuit panel vacated his sentence as excessive and remanded for resentencing. We granted the state’s application to review both aspects of the decision below and reverse for reasons that follow.
 

 The evidence at trial established that on the afternoon of February 2, 2007, Effie LeBleu, a 26-year-old mother of several children, two of whom lived with her at home, appeared at the Cabrini Hospital in Glenmora, Louisiana, with her eight-month-old daughter. According to Vanessa Barnes, a registered nurse on duty in the emergency room that day, the baby was covered with bruises, in pain, and “just very unsettled, very distressed.” The child was so unsettled, and remained that way for “hours,” that Barnes was unable to lift or hold her in her arms. She just “kind of cradled her in a sheet and never actually grabbed her.” The baby was admitted, and on the following day, Dr. Amarjit Nijjar examined her in the hospital’s emergency room and determined that, in effect, she had been battered from head to toe. Dr. Nijjar testified that the baby “had multiple bruising on the face, on the head, on the right side of the face, on the left side of the jaw, back of the neck, both ears were all red and swollen up.” The baby’s upper lip was swollen and bruising extended from the right side of her body across her abdomen and over both buttocks and down both thighs to her calves. The bruises appeared of different ages. They were bilateral, and they were “all over,” an unmistakable sign, in the doctor’s opinion, of deliberate and systematic abuse. The doctor detected a hemato-ma under the muscle in the baby’s hip area and noticed that the child had difficulty moving her left arm, which also displayed significant bruising. An x-ray determined that the humerus bone of her left arm appeared | ^fractured at the elbow. The x-ray also revealed evidence of an older fracture at the same point. Dr. Nijjar testified that he became so upset by the appearance of the eight-month-old child that he had to step outside of the examination room to gather himself.
 

 In the opinion of Dr. Mark Dodson, an orthopedic surgeon who also examined the baby on February 3, 2007, the x-ray of the child’s elbow revealed a relatively new fracture, which had probably occurred within the prior three days, and displayed signs of an older fracture in the same area occurring anywhere from two to four weeks before he examined the child. The
 
 *375
 
 orthopedist testified that the fractures, new and old, of the baby’s elbow would not have been caused by a toddler falling as she attempted to walk but by “a twisting injury or a fall from a height.”
 

 The child’s mother testified at trial and described for jurors the events prompting the hospital visit on February 2, 2007. Effie LeBleu testified that at the time of the injury she was living in a trailer owned by defendant’s mother with defendant and two of her children. In the early morning hours of February 2, 2007, she awoke to the sound of her eight-month-old daughter crying. She testified that defendant would not let her out of bed because her children “were very, very spoiled to me, and he didn’t like the idea that my kids were spoiled.” Defendant got up instead and took the child into the laundry area to change her. Ms. LeBleu then heard a “boom boom” sound. When he returned with the child, defendant explained that the baby had “wiggled” away from him. At that time, she did not question the explanation because the child could not walk and often wiggled or squirmed when she moved. The baby stopped crying when defendant put the child down on the mattress but the child wiggled off her bedding after loosing her pacifier. Defendant responded by grabbing a belt. According to LeBleu, when she implored defendant not to hit her daughter, he replied, “I wasn’t going to, I was just thinking about it,” and he hit her instead on her hand underneath a blanket.
 

 Later in the morning, at approximately 7:00 a.m., Ms. LeBleu woke up and noticed bruises on the baby’s leg. However, she did not notice any impairment of the child’s left arm. When asked why she did not immediately summon help for her baby, Ms. LeBleu explained that she did not have a phone, and defendant carefully monitored her telephone calls on his own phone. He otherwise kept her isolated from family and friends with the help of his own mother who lived nearby. Instead of reporting the problem immediately, Ms. LeBleu went shopping for diapers with defendant and her daughter, and after they returned home, defendant went fishing for the day. Ms. LeBleu seized on the opportunity to seek a neighbor’s help. Thereafter, she contacted the Glenmora Police, and they called Cabrini Hospital. Ms. LeBleu then brought her baby to the hospital that afternoon at approximately 2:00 p.m., and the child was admitted immediately.
 

 Ms. LeBleu informed jurors that defendant had struck her daughter on the hand with a fly swatter when she cried, that he could not stand the baby crying, and that he would “whip” the child for crying. Defendant had also hit Ms. Lebleu with a belt in the past. She further acknowledged that she had given birth to six children beginning at age 15 and that she had lost them all in one fashion or another, in part because social services became involved in her life virtually at the outset of her child bearing years after she moved out of her parents home and became pregnant with her first child when she was 14 years old. Ms. LeBleu explained that her first child died of SIDS, although the death certificate listed the |scause as undetermined. She gave up her next two children to her sister to forestall social services from removing them from the family altogether. Her fourth child resided elsewhere in Louisiana with his father, and her fifth child, a son, and sixth, her daughter and victim in the present case, were removed from the trailer home she shared with defendant following the incident on February 2, 2007. The children were subsequently adopted. Ms. LeBleu testified that the children were removed from the home because she had failed to contact the authorities for several hours after noticing the bruises on
 
 *376
 
 her daughter’s legs, and she denied abusing either of them.
 

 Jennifer Fields, an investigator for the Rapides Parish Office of Community Services, confirmed that the children had been removed from the home because of the delay by Effie LeBleu in reporting her daughter’s battered condition. Fields also stated that before the present case, “we had no validated cases of abuse or neglect on Ms. LeBleu.”
 

 Defendant did not testify at trial but in a statement to the police following his arrest, he related that he had been living with Effie LeBleu and two of her children in the trailer for approximately six months. He had moved in three days after meeting Ms. LeBleu. Defendant told the police that when the baby began crying in the early morning hours of February 2, 2007, Ms. LeBleu would not wake up, and so he got up to change the child. He took her into a hallway which served as a laundry area and put her on the washing machine. After he changed her and began pulling up her pants, she “jumped” out of his hands and fell face first into the control panel of the dryer next to the washing machine. Defendant denied that the baby fell to the floor but told the police that he noticed bruises on her face after he brought her back from the laundry area and placed her on a Ifiinattress. In his opinion, Effie Le-Bleu had spoiled her children, and defendant acknowledged that he became the disciplinarian in the family for both the baby and her three-year-old brother and that he had once struck the baby with a fly swatter. Defendant further acknowledged that he had never seen Ms. LeBleu abuse the children, but he also stated that he did not spend that much time in the trailer.
 

 Defendant also gave a statement to Ray Cooper, a child protection investigator for the Office of Community Services. According to Cooper, defendant informed him that when he awoke to the sound of the baby crying, and Ms. LeBleu would not wake up, he picked up the child despite a bad back which had placed him on disability, and, “as he’s going into the washroom he dropped her.” “That was his statement,” Cooper recalled, “the child jumped out of his hands.”
 

 Defendant’s parents testified in his defense. Both Jimmy and Fay Strother saw defendant, Effie LeBleu, and the two children when they were buying diapers on the morning of February 2, 2007. Although defendant and Ms. LeBleu stated that the baby was bruised at that time, defendant’s parents denied seeing any bruises. Jimmy Strother further testified that Ms. LeBleu improperly pulled the baby out of her carriage by grasping only one arm, “and that wasn’t the proper way to do a child, a baby.” For her part, Fay Strother claimed that it was Effie LeBleu, not defendant, who used a belt and fly swatter on the baby. Mrs. Strother also testified that she saw Ms. LeBleu throw the baby on the couch, causing the child to fall off and hit her head on the floor, giving rise to knots on her forehead. Although Mrs. Strother testified that she never saw defendant hit the baby, when asked whether she would be shocked to hear that he hit the baby with a fly swatter, 17she stated, “not really.” She also admitted that she had seen defendant “pat” the baby on her bottom, but denied that he whipped the child.
 

 The state structured its case to account for the long-term abuse of the infant and for a specific instance involving the fracture of the child’s left arm. The second count of the bill of information thus charged defendant with cruelty to juveniles encompassing the period of time from July 8, 2006 to February 2, 2007. In pertinent part, the offense is defined as the “intentional or criminally negligent
 
 *377
 
 mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child.” La.R.S. 14:93(A)(1). The first count of the bill of information charged defendant with the more serious offense of second degree cruelty to juveniles committed on or about February 2, 2007, the day that defendant was alone with the baby changing her diaper. The offense is defined as the “intentional or criminally negligent mistreatment or neglect by anyone over the age of seventeen to any child under the age of seventeen which causes serious bodily injury or neurological impairment to that child.” La.R.S. 14:93.2.3(A)(1). The term “serious bodily injury” is specifically defined as “bodily injury involving protracted and obvious disfigurement or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or substantial risk of death.” La.R.S. 14:93.2.3(A)(2).
 

 There was no dispute at trial that the baby had generally experienced unjustifiable pain and suffering which accompanied the widespread bruising of her body and which was graphically displayed to the medical personnel who attended to her at the Cabrini Hospital, and that she had suffered serious bodily injury in the multiple fractures of her left arm at the elbow. The only contested issue at trial |sbecame which one of the two adults in the trailer committed the abuse. Defense counsel submitted as a reasonable hypothesis of innocence that Effie LeBleu, whom even the prosecutor conceded during closing argument “will never get mother of the year,” and not defendant, had caused the extensive bruising of her own child and the fracturing of her arm. Counsel suggested that much of the abuse had taken place in the few hours Effie LeBleu spent left alone with her children before taking her daughter to the hospital, after defendant left on his fishing trip, and after Fay and Jimmy Strother had seen all of them together shopping for diapers earlier that morning, when defendant’s father observed Ms. LeBleu lift the child out of her carriage by one arm, supplying the torque Dr. Nolan thought necessary and sufficient to fracture the baby’s elbow. The possibility that the abuse occurred during those hours was bolstered by Effie LeBleu’s testimony that her daughter stopped crying and went back to sleep after the diaper-changing incident in the early morning hours, yet appeared extremely unsettled and distressed when she arrived at the Cabrini Hospital shortly after 2:00 p.m. that afternoon.
 

 On appeal, the Third Circuit panel concluded that the evidence presented at trial was sufficient to support the jury’s verdict of guilty as charged on count two of the bill of information charging the offense of cruelty to juveniles. It thereby found that jurors rationally rejected defendant’s hypothesis of innocence at trial that “the State failed to prove it was he who inflicted the injuries beyond a reasonable doubt,” and not Effie LeBleu.
 
 Strother,
 
 09-0110 at 18, 19 So.3d at 609. The court of appeal acknowledged that the verdict rested on credibility determinations “within the sound discretion of the trier of fact and [would not] be | ndisturbed unless clearly contrary to the evidence.”
 
 Id.,
 
 09-0110 at 20, 19 So.3d at 610.
 

 On the other hand, the court of appeal found that evidence did not support the jury’s verdict on count one, evidently a compromise made possible when defense counsel did not object to the trial court’s charge listing attempted second degree cruelty to a juvenile as a responsive verdict, because the evidence was not sufficient to support the charged offense, or, for that matter, the lesser included offense of cruelty to juveniles.
 
 Cf. State ex rel.
 
 
 *378
 

 Elaire v. Blackburn,
 
 424 So.2d 246, 251-52 (La.1982) (“[A]t least when the defendant fails to interpose a timely objection to a legislatively responsive verdict, this court will not reverse the conviction if the jury returns such a verdict, whether or not that verdict is supported by the evidence, as long as the evidence is sufficient to support the offense charged.”). In this respect, the court of appeal agreed with the defense that the state did not prove beyond a reasonable doubt that he, as opposed to Effie LeBleu, had either intentionally or through criminal negligence, inflicted the trauma which fractured the child’s left arm at the elbow on or about February 2, 2007, although the injury could have occurred on that date within the time frame established by Dr. Nolan. The Third Circuit noted that “[tjhere was no testimony indicating that Defendant was alone with the baby when the injury to her arm occurred,”
 
 Strother,
 
 09-0110 at 8, 19 So.3d at 608, and that “there was minimal testimony or other evidence given regarding acts committed intentionally or negligently by Defendant that would have resulted in the injury to the child’s arm.”
 
 Id.,
 
 09-0110 at 14, 19 So.3d at 607. The only evidence that defendant could have caused the injury to the baby came from the testimony of Ray Cooper with regard to the statement made by defendant that he had dropped the baby on the way to the | inlaundry area in the trailer. The Third Circuit dismissed that testimony as a “second-hand report.”
 
 Id.,
 
 09-0110 at 16, 19 So.3d at 608. While Effie LeBleu offered partial corroboration that some sort of event took place on the morning of February 2, 2007, because she had heard a “boom boom” occur while defendant was in the laundry area with her daughter, she testified only with regard to noticing bruises on her daughter later that morning and evidently did not notice any impairment of her daughter’s left arm. Finally, the court of appeal concluded that “[i]t cannot be said Defendant refused to seek medical attention for the child’s injured arm, thereby causing unjustifiable pain and suffering, since there was nothing which established that he was aware of the injury.”
 
 Id.,
 
 09-0110 at 15-16, 19 So.3d at 608.
 

 However, an appellate court may impinge on the fact finder’s discretion and its role in determining the credibility of witnesses “only to the extent necessary to guarantee the fundamental due process of law.”
 
 State v. Mussall,
 
 523 So.2d 1305, 1310 (La.1988). In determining the sufficiency of the evidence supporting a conviction, an appellate court must preserve “ ‘the factfinder’s role as weigher of the evidence’ by reviewing ‘all of the evidence ... in the light most favorable to the prosecution.’ ”
 
 McDaniel v. Brown,
 
 558 U.S. -, -, 130 S.Ct. 665, 674, 175 L.Ed.2d 582 (quoting
 
 Jackson v. Virginia,
 
 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). When so viewed by an appellate court, the relevant question is whether, on the evidence presented at trial,
 
 “any
 
 rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.”
 
 Jackson,
 
 443 U.S. at 319, 99 S.Ct. at 2789. Applied in cases relying on circumstantial evidence, such as the present case in which there is no direct evidence that defendant performed any intentional act that caused serious bodily |1Tinjury to the child when her arm fractured at the elbow, this fundamental principle of review means that when a jury “reasonably rejects the hypothesis of innocence presented by the defendant ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt.”
 
 State v. Captville,
 
 448 So.2d 676, 680 (La.1984).
 

 In the present case, and in a decision seemingly at odds with itself, the
 
 *379
 
 court of appeal found that jurors rationally and reasonably rejected defendant’s hypothesis of innocence, that Effie LeBleu inflicted numerous and varied injuries on her own daughter, as reflected by the extensive bruising all over her body, when it found him guilty on the count charging cruelty to juveniles, but acted irrationally when it rejected defendant’s same hypothesis of innocence offered on the count charging him with second degree cruelty to juveniles involving the specific trauma which fractured the child’s arm at the elbow. However, to reach that result with respect to the more serious charge of second degree cruelty to juveniles, the court of appeal had to reverse perspectives and view the evidence in a light most favorable not to the state, but to the defendant. Thus, its observation that “[wjhile the diaper-changing incident occurred within the time frame of when the doctors theorized the injury occurred, Defendant’s account of what happened did not indicate an injury to the baby’s arm occurred at that time,”
 
 Strother,
 
 09-0110 at 7, 19 So.3d at 603, simply acknowledged that there was no
 
 direct
 
 evidence that he caused the injury at that time, just as there was virtually no direct evidence, apart from Effie Le-Bleu’s testimony, and defendant’s statement, about his use of a fly swatter on at least one occasion, that he had also caused the bilateral bruising of the child from head to toe over the extended period of time alleged in count two |12of the bill of information, although the jury held him fully accountable for that conduct in a verdict affirmed by the court of appeal.
 

 However, viewing the evidence from the correct, pro-prosecution perspective, Judge Amy, dissenting, observed that “the jury could have found this [statement about the diaper change] inconsistent with the degree of bruising and injury, including a fractured arm, discovered at the hospital.”
 
 Strother,
 
 09-0110 at 1-2, 19 So.3d at 614 (Amy, J., dissenting). In fact, defendant gave not one but two accounts of what happened, one to the police, and the other to Ray Cooper, the child protection investigator, and the statements conflicted. The statements purported to give alternative exculpatory accounts, that the child either squirmed away from defendant just after he had changed her on the washing machine and pitched face first into the back panel of the dryer, but did not fall to the floor, or that she had jumped out of his arms and fell to the floor as he carried her to the laundry area to change her. The court of appeal discounted as a “secondhand” report defendant’s statement to Ray Cooper, but under Louisiana law, the statement constituted non-hearsay evidence admissible for a fact finder to assess as substantive evidence in the context of the other evidence in the case. La.C.E. art. 801(D)(2)(a) (exempting from hearsay rule a statement offered against a party which is “[h]is own statement, in either his individual or a representative capacity.”).
 
 Any
 
 rational trier of fact would find the inconsistency in defendant’s statements highly significant because it provided an evidentiary basis for concluding that neither account of an inadvertent, accidental fall caused by the child’s squirming and wiggling was true, yet both statements acknowledged that some sort of incident had taken place in those early morning hours when defendant was alone with the baby, after which, hours later, the mother then appeared at the hospital emergency 11sroom alone with her badly battered child with a freshly broken arm while defendant went fishing. Defendant’s statement to the police further acknowledged that Effie LeBleu did not abuse the children and that he, not her, was the disciplinarian in the family because he shared her view that the children were “spoiled to her.” As judge Amy observed, given defendant’s admis
 
 *380
 
 sion that he
 
 disciplined,
 
 an eight-month-old baby, rational jurors could reasonably find “evidence of the defendant’s rage” in Effie LeBleu’s testimony that defendant grabbed a belt to strike the baby moments after she heard the thumping sound from the laundry area, because defendant generally could not tolerate the baby’s crying and could not rely on her to discipline her own children, and “concluded that the abuse was occurring at the time of the loud noise and while out of [her] sight.”
 
 Strother,
 
 09-0110 at 1, 19 So.3d at 614 (Amy, J., concurring in part and dissenting in part).
 

 Our independent review of the record shows that jurors had a full and fair opportunity to consider defendant’s hypothesis of innocence and weigh the inferences from testimony that the baby settled down after the diaper changing incident but was then unsettled and distraught hours later when she arrived at the hospital. Jurors clearly found the testimony of Effie LeBleu credible, whatever reservations they may have shared with the prosecutor about her capabilities as a mother. Viewing the evidence in a light most favorable to the state, and according due weight to the credibility determinations made by the jury, we conclude that the jury reasonably rejected defendant’s hypothesis of innocence and found that he had been abusing the child during the time they lived together with the mother in the trailer and then caused the fracture of her arm when he was alone with her in the early morning hours of February 2, 2007. No other alternative hypothesis is apparent from the record and the lesser verdict of attempted second degree cruelty |14to juveniles did not necessarily reflect doubts about the sufficiency of the state’s evidence to prove the charged offense because Louisiana’s system of responsive verdicts provides juries with the plenary power of nullification to return a lesser verdict even in the face of overwhelming evidence of guilt.
 
 See State v. Porter,
 
 93-1106, p. 4 (La.7/5/94), 639 So.2d 1137, 1140 (“Treating the jury’s prerogative to return a responsive verdict similar to the jury’s power of nullification, this court has consistently held that the jury must be given the option to convict the defendant of the lesser offense, even though the evidence clearly and overwhelmingly supported a conviction of the charged offense.”).
 

 The court of appeal therefore erred in reversing defendant’s conviction and sentence on the count charging second degree cruelty to juveniles. Further, the majority on the panel also erred by vacating defendant’s sentence on his conviction, which it affirmed, for cruelty to juveniles. In that respect, because it had reversed defendant’s conviction for attempted second degree cruelty to juveniles and vacated sentence on that count, the court of appeal had no need to address defendant’s argument, advanced in his motion to reconsider sentence filed in the district court, that, at the least, his sentences should run concurrently and not consecutively. The Third Circuit panel focused instead on the question of whether the maximum sentence of 10 years imprisonment at hard labor on defendant’s conviction for cruelty to juveniles was itself excessive in light of the general rule that maximum sentences are generally reserved for the most serious offenses and the worst offenders.
 
 See, e.g., State v. Telsee,
 
 425 So.2d 1251, 1253 (La.1983) (“The goal of the legislative scheme embodied in [the sentencing guidelines of La. C.Cr.P. art. 894.1] is to tailor the individual sentence imposed on the particular defendant to the particular circumstances of the case. The result |1fiwhich obtains is that the maximum sentences are to be reserved
 
 *381
 
 for the most egregious and blameworthy of offenders within a class”).
 

 In making the assessment, the court had a relatively sparse record for review. The trial court had conducted a brief hearing at which defendant’s parents and defendant testified. Fay and Jimmy Strother informed the court of the extent to which they depended on their son to help them with a number of physical complaints brought on by advancing age. Defendant simply asked the court for mercy so he could take care of his infirm mother, but did not acknowledge any moral culpability for his crimes. The state did not call any witnesses, but the prosecutor informed the court that the victim’s arm remained bowed as a result of the fractures at the elbow, and that she might need surgery to correct the defect. In that regard, her adoptive parents had been taking her to Children’s Hospital in New Orleans for treatment. The adoptive parents had noted that the child, who was two years old by the time of sentencing, showed some signs of continuing psychological difficulties, particularly in relating to men, and displayed somewhat diminished motor skills.
 

 In imposing sentence, the trial court emphasized the need to deter the public generally from committing similar crimes and to deter defendant specifically from similar conduct in the future in light of the court’s opinion that defendant did not think he had done anything wrong, yet “terrorized” Effie LeBleu’s daughter and used her as “a punching bag” for the six months she was around him. Thus, taking into account those factors that the court always' considers in sentencing,
 
 i e.,
 
 rehabilitation, general deterrence, the wishes of the victim, and specific deterrence, the trial judge imposed consecutive terms of imprisonment of 10 years at hard labor. In response to the state’s request, the trial court complied with La.C.Cr.P. |lfiart. 890.1 by stating on the record that both offenses were crimes of violence as enumerated in, or generally defined by, La.R.S. 14:2(B).
 

 On that record, the Third Circuit found that defendant’s maximum sentence appeared excessive “when compared to similarly situated offenders and the nature of the offense.”
 
 Strother,
 
 09-0110 at 20, 19 So.3d at 610, The court of appeal thus looked to other cases involving extremely young children who had been abused in a variety of ways, including bruising and fractured bones, or other instances of serious bodily harm, in which the defendants received maximum or near-maximum sentences upheld on appeal.
 
 See, e.g., State v. Freeman,
 
 409 So.2d 581 (La.1982) (defendants abused their 17-month-old child in a variety of ways by leaving bruises, lacerations, lesions consistent with human bites, and cigarette burns, and by fracturing one forearm);
 
 State v. Hollins,
 
 43,168 (La.App. 2nd Cir.4/30/08), 981 So.2d 819 (defendant left bite marks on both arms of a three-month-old victim, fractured his upper and lower left leg, upper right arm, and left collarbone, fractured his ribs bilaterally, and bruised the infant’s brain);
 
 State v. Taylor,
 
 31,860 (La.App. 2nd Cir.2/24/99), 733 So.2d 72 (defendant shook a two-month-old child violently, resulting in partial permanent paralysis, permanent impairment of vision, and neurological damage). Compared to those cases, defendant did not appear to the majority as among “the most blameworthy offenders,” and he was otherwise a first felony offender.
 
 Strother,
 
 09-0110 at 24-25, 19 So.3d at 613. The majority on the panel thus concluded that the maximum sentence imposed on defendant “amounts to a needless and purposeless imposition of pain and suffering,” even conceding “a prior injury to the victim’s arm and that the victim was undoubtedly battered.”
 
 Id.,
 
 09-0110 at 24, 19 So.3d at 613.
 

 
 *382
 
 117However, Judge Amy, who would have affirmed defendant’s conviction and sentence for second degree cruelty to juveniles, dissented on this point as well in light of “the child’s age as well as the serious and repetitive nature of the abuse.”
 
 Strother,
 
 09-0110 at 2, 19 So.3d at 614 (Amy, J., concurring in part and dissenting in part). We agree with Judge Amy because the goal of sentence review is not to fine tune the sentence imposed according to what an appellate court may conclude is the more appropriate punishment for the offense and for the particular offender, but to identify those sentences which fail to serve any of the recognized penological goals of sentencing and thus result in the needless infliction of pain and suffering.
 
 See Ewing v. California,
 
 538 U.S. 11, 25, 123 S.Ct. 1179, 1187, 155 L.Ed.2d 108 (2003) (“A sentence can have a variety of justifications, such as incapacitation, deterrence, retribution, or rehabilitation.”) (citations omitted);
 
 cf. Graham v. Florida,
 
 560 U.S. -, -, 130 S.Ct. 2011, 2028, 176 L.Ed.2d 825 (2009) (“A sentence lacking any legitimate penological justification is by its nature disproportionate to the offense.”) What comparative proportionality review conducted by the court of appeal in the present case reveals is that, notwithstanding the conclusion that the majority on the panel drew from it, the trial court did not arbitrarily misuse its broad sentencing discretion by determining that defendant’s deliberate, repetitive, and physically abusive conduct, resulting in the unjustifiable pain and suffering of an extremely young child, and, ultimately in serious bodily harm to the infant in the multiple fractures of her arm, placed him among the most blameworthy of offenders in Louisiana charged with the intentionally cruel mistreatment of children under the age of 17 years.
 

 We therefore find no abuse of the trial court’s discretion in imposing maximum terms of imprisonment at hard labor on either of defendant’s | ^convictions, even considering the greatly reduced possibility for early release on parole because of the court’s designation of the offenses as crimes of violence.
 
 See
 
 La.R.S. 15:574.4(B); R.S. 15:571.3(B)(2)(a).
 
 [2]
 
 Nor for the same reasons do we find a clear abuse of discretion by the trial court in specifying that the sentences will run consecutively as opposed to concurrently, thereby exacting cumulative punishment to the fullest extent authorized by the legislature, as contemplated by the state when it structured the prosecution in two counts accounting for the long-term and acute abuse of the victim, although defendant’s crimes formed part of the same continuing course of conduct.
 
 Cf. State v. Williams,
 
 445 So.2d 1171, 1182 (La.1984)(‘While it is true that as a general rule sentences served for crimes arising out of a single course of conduct are served concurrently instead of consecutively, this court has never held that consecutive sentences are necessarily excessive. Other factors must be considered.”)(footnote omitted).
 

 Accordingly, defendant’s conviction and sentence for attempted cruelty to juveniles are reinstated, as is defendant’s sentence on his conviction for cruelty to juveniles as
 
 *383
 
 affirmed by the court of appeal. This case is remanded to the district court for purposes of execution of sentence.
 

 COURT OF APPEAL DECISION REVERSED IN PART, AFFIRMED IN PART; CONVICTION AND SENTENCE FOR ATTEMPTED SECOND DEGREE CRUELTY TO JUVENILES REINSTATED; CONVICTION FOR CRUELTY TO JUVENILES AFFIRMED AND SENTENCE REINSTATED; CASE REMANDED.
 

 [1]
 

 . Retired Judge Philip C. Ciaccio, assigned as Justice ad hoc, sitting for Chief Justice Catherine D. Kimball.
 

 [2]
 

 . The offense of second degree cruelty to juveniles is a specifically enumerated crime of violence. La.R.S. 14:2(B)(38). In addition, defendant makes no argument here that the trial court erred when it also denominated the offense of cruelty to juveniles as a crime of violence, although it is not specifically enumerated, because, apart from the multiple fractures of the infant's arm at the elbow, the present case revealed other instances of intentional mistreatment "that, by its very nature, involve[d] a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.” La.R.S. 14:2(B).