STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

11-1402

STATE OF LOUISIANA

VERSUS

LARRY JOSEPH MCKITHERN

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 3678-11
HONORABLE CLAYTON DAVIS, DISTRICT JUDGE

**********

ULYSSES GENE THIBODEAUX
CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and
Elizabeth A. Pickett, Judges.

CONVICTIONS AFFIMRED.  HABITUAL
ADJUDICATION VACATED; REMANDED.

John Foster DeRosier
District Attorney - 14th Judicial District Court
P. O. Box 3206
Lake Charles, LA 70602-3206
Telephone:  (337) 437-3400
COUNSEL FOR:
        Plaintiff/Appellee - State of Louisiana

Edward Kelly Bauman
Louisiana Appellate Project
P. O. Box 1641
Lake Charles, LA 70602-1641
Telephone:  (337) 491-0570
COUNSEL FOR:
        Defendant/Appellant - Larry Joseph McKithern

**Karen C. McLellan**
**The Gray Law Firm**
**P. O. Box 1467**
**Lake Charles, LA 70602-1467**
**Telephone: (337) 494-0694**
**COUNSEL FOR:**
**Plaintiff/Appellee - State of Louisiana**

**THIBODEAUX, Chief Judge.**

Larry J. McKithern was found guilty of armed robbery, a violation of La.R.S. 14:64, and aggravated arson, a violation of La.R.S. 14:51.  At the sentencing hearing, the trial court found McKithern to be a second habitual offender.  The court sentenced McKithern to the maximum term of one hundred and thirty years on the charge of armed robbery and thirty years on the charge of aggravated arson pursuant to La.R.S. 15:529.1.  The court ordered both sentences to run consecutively.  For the following reasons, McKithern's convictions are affirmed.  Because the State offered no proof that a ten-year cleansing period had not elapsed, McKithern's adjudication as a habitual offender and sentences are vacated.  This matter is remanded for further proceedings and resentencing.

I.

## ISSUES

We shall consider whether:

(1)     there was insufficient evidence to convict McKithern, where the evidence largely centered on testimony of two witnesses, both of whom were intoxicated at the time of the offense;

(2)     the State failed to prove the ten-year cleansing period had not elapsed between McKithern's previous and present convictions, where McKithern was convicted and sentenced to eighteen years in 1988 and where the State did not show whether the date of McKithern's discharge was actually eighteen years from the conviction or an earlier date;

(3)     the trial court erroneously disallowed McKithern to present an alternative theory, where McKithern's first attempt to raise the alternative theory was during the closing argument;

(4)     McKithern received ineffective assistance of counsel because the counsel failed to object to allegedly hearsay testimony, where the testimony was regarding a person's actions the witnesses personally observed;

(5)     the jury instruction on reasonable doubt was deficient;

(6) the counsel's failure to object to jury instructions and to move to quash the indictment resulted in counsel's defective performance that prejudiced McKithern; and,

(7) the trial judge erred by not recusing himself because of bias and prejudice against McKithern, where the judge allegedly issued the arrest warrant, set McKithern's bond, presided over a bond-reduction hearing, sequestered McKithern's witnesses without sequestering the State's witnesses, and disallowed irrelevant questions.

II.

## FACTS

On January 3, 2009, a deputy of the Jefferson Davis Sheriff's Office was dispatched to a house fire on Pujol Road. Upon arrival, he found an intoxicated elderly gentleman. The man told the deputy that he and three others were partying all night; one of them, Larry, "poured gasoline on the trailer while he was in it and ignited it with either a match or a lighter."

Earlier that day, Gerald Endicott asked Joey Smith to take him from Beaumont, Texas, to Lake Charles to look at a vehicle he planned to buy. The pair arrived around lunchtime on that day and met Richard Green at the trailer. People were "hanging out," and they "bought some beers and whiskey and made a day of it." McKithern and his "girlfriend" were present when Endicott and Smith arrived. When the party ended, Endicott, Smith, and Green went to bed in the trailer. All of them were intoxicated.

Larry returned after dark and asked if they had any beer left. He and Smith drank more beer, and Larry "started asking [Smith] weird things like if [he] was a cop." Smith said goodnight and went inside. Larry again knocked on the door, "and this time, he stuck his knife in [Smith's] face" and said to give him all his money. Smith gave Larry five dollars; Larry was not happy with that and checked Smith's pants and took his cellular phone.

2

Larry then took two dollars from Green and twenty dollars from Endicott while holding the knife to Endicott's neck. When Larry went outside, Smith tried to get out of the trailer, but Larry "had the door braced shut somehow." When Larry came back inside, he had "a fire type of chemical" that he poured on the three men and around the trailer. He lit the coffee table on fire while Smith was three feet away from him with flammable fluid on him. Smith "dove on him and out the door [they] went, and the other two fellows went out the door" while "[t]he house was blazing." "Larry" hit Smith in the face and kicked him a couple of times, then "broke the window out of [Smith's] truck and walked off in the darkness." Smith got in the truck to move it away from the fire; he and Endicott "started to head to town."

Smith sustained multiple injuries (but no burns) and "couldn't hold it together," so he told Endicott to drive him to the nearest hospital. Smith passed out and awoke the next morning. Endicott was intoxicated and feared getting charged with driving while intoxicated, so he parked the truck behind a church "out in the woods," somewhere close to Lake Charles, and hid. The next day, Smith testified he drove himself to a hospital in Beaumont, where "they put a rag type of a bandage on [his face] and sent [him] to Harris County Hospital in Houston." At some point, Smith spoke to "a Detective Gertz" in Lake Charles.

Smith described the man they knew as Larry as "pretty husky fellow . . . [h]ad tattoos around his neck, all the way around his neck where it stuck out of his T-shirt." Smith did not see McKithern in the courtroom at trial. Nevertheless, he later testified, "I guess that's him, but it don't [sic] look like him. His hair is longer. He's just not the same as he used to look." When asked about McKithern's tattoos, Smith said "you can see it on his neck through his shirt." Smith testified again McKithern "don't [sic] look the same today as he did then."

Green testified McKithern and his "girlfriend" were at a barbecue at his trailer that day. Green also had difficulty identifying McKithern at trial. When asked

if he saw McKithern in the courtroom, Green replied, "[w]ait a minute. You know what, I don't know. That might be him right there, but he's changed (indicating). He – he never wore glasses." When the trial court ordered McKithern to remove his glasses, Green testified, "[y]eah, that's him," and then commented, "I'm sorry, Larry . . . You shouldn't have done that to me." The court noted "that the witness has identified the defendant as Mr. Larry McKithern." Green testified McKithern "was [his] best friend."

According to Green, on the day of the incident, McKithern returned to the trailer after dark and demanded the return of one hundred dollars he claimed Smith had stolen from him. McKithern "threw gas all over [them] all and blockaded the door and walked out and lit it and just walked out the door and blockaded the door." McKithern took all their cellular phones. Green testified McKithern first beat Smith with a club inside the trailer and then outside before he threw the gas on them and blocked the door. McKithern told Green, "this ain't about you," but Smith owed him one hundred dollars and he was "going to get it." Green "got up and went to the bathroom" and shut the door when the fighting started. When he came out, McKithern and Smith were fighting outside. McKithern said he would kill all of them before he lit the fire. Green's nylon coat melted onto him, and he had to have it cut off at the hospital as a result of the fire.

Green testified they were able to get out of the burning trailer because Endicott "backed up and he knocked the hinges off the door." When asked whether he was drunk that day, Green responded, "[o]h, no, I was inherent [sic]. I knew what I was doing. I was cooking. I cooked all day . . . I don't get drunk." He also testified he had consumed alcohol and was impaired that day; he had "sipped all day." According to Green, McKithern and Smith had left together around noon, and "they were gone a long time." When they returned, they were "messed up;" Green believed "[y]ou can look at somebody and know when they're messed up."

4

Admitted into evidence as Exhibit S-3 were four photographs alleged to depict burns on Green's face and hands. Green, however, did not know who took the photographs or where or when they were taken. He assumed "the cops" took them "when they were at the burn scene," but said he "was in shock" and "[didn't] even remember what happened." The trial court admitted the photographs into evidence over McKithern's objection because "they accurately represent his condition after this event." No photos were shown to depict the burns allegedly caused by the melted coat.

Jason Gertz, Calcasieu Parish Sheriff's Office violent crimes detective, obtained an arrest warrant for McKithern based on the consistent statements obtained by the Sheriff's Office. His investigation began on January 9, 2009. He observed burns on Green's hands and later learned he had sustained second-degree burns.

Endicott was not present and did not testify at trial. On January 9, 2009, a deputy took photographs of what purported to be Endicott's injuries sustained on January 3 or 4, 2009, including bruising to the back of his calves and arm. One of the photographs showed a piece of fabric from Endicott's jeans that was cut off to test for the presence of accelerants. The fabric was submitted to the crime lab on January 9, 2009, but at the time of trial, no lab analysis had been received. Deputy Gertz admitted he could not dispute whether the brown stains shown on the jeans in the photographs were barbecue stains.

McKithern's wife, Reva McKithern, testified at trial that on January 3, 2009, Green had invited them to a barbecue. They arrived around 11:00 a.m., 12:30 p.m. at the latest. They left around forty-five minutes later and went to their home on Mark Lebleu Road. She did not return to Green's home that day, and, to her knowledge, McKithern did not return either. Rather, McKithern and a friend worked on the friend's truck in their yard; they went to the store, but were not gone long. Ms. McKithern believed McKithern was in bed with her from the time she fell asleep

5

around 10:00 or 10:30 p.m. until she awoke around 7:30 the next morning. The McKitherns had Chihuahua dogs who barked if they got up during the night. Ms. McKithern did not get up during that night, and the dogs did not wake her. She admitted she could not account for McKithern's whereabouts while she was asleep.

## III.

## LAW AND DISCUSSION

### Error Patent

The trial court gave McKithern erroneous advice as to the time period for filing post-conviction relief. McKithern was advised at sentencing that he has two years from the date of sentencing to apply for post-conviction relief. According to La.Code Crim.P. art. 930.8, the prescriptive period for filing post-conviction relief is two years, and it begins to run when a defendant's conviction and sentence become final under the provisions of La.Code Crim.P. arts. 914 or 922. Because, for the reasons expressed below, we remand this case for resentencing, the trial court is instructed to notify McKithern of the La.Code Crim.P. art. 930.8 provisions at resentencing.

### (1) Sufficiency of Evidence

McKithern claims the evidence at trial was insufficient to find him guilty beyond a reasonable doubt. The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *State v. Captville*, 448 So.2d 676, 678 (La.1984)). The *Jackson* standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to

substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521 (citing *State v. Robertson*, 96-1048 (La. 10/4/96), 680 So.2d 1165). The appellate court's function is not to assess the credibility of witnesses or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442.

The factfinder's role is to weigh the credibility of witnesses. *State v. Ryan*, 07-504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. Thus, other than insuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at 1270 (quoting *State v. Lambert*, 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726-27).

> However, an appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall*, 523 So.2d 1305, 1310 (La.1988). In determining the sufficiency of the evidence supporting a conviction, an appellate court must preserve "'the factfinder's role as weigher of the evidence' by reviewing 'all of the evidence . . . in the light most favorable to the prosecution.'" *McDaniel v. Brown*, 558 U.S. ___, ___, 130 S.Ct. 665, 674, 175 L.Ed.2d 582 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). When so viewed by an appellate court, the relevant question is whether, on the evidence presented at trial, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789. Applied in cases relying on circumstantial evidence, . . . this fundamental principle of review means that when a jury "reasonably rejects the hypothesis of innocence presented by the defendant[ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville*, 448 So.2d 676, 680 (La.1984).

*State v. Strother*, 09-2357, pp. 10-11 (La. 10/22/10), 49 So.3d 372, 378.

"Aggravated arson is the intentional damaging by any explosive substance or the setting fire to any structure, watercraft, or movable whereby it is foreseeable that human life might be endangered." La.R.S. 14:51. "Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon." La.R.S. 14:64.

The State offered evidence McKithern poured a flammable liquid on the trailer and the three men and set fire to the trailer. The State also offered evidence McKithern held a knife to Endicott's throat and took money from him, Green, and Smith. Nevertheless, the evidence largely centered on testimony from Green and Smith, both of whom were intoxicated throughout the events of January 3, 2009. No physical evidence was presented to confirm the presence (or absence) of any type of accelerant or to verify the cause or extent of the injuries to Green and Smith. The rather bizarre facts of this incident certainly give rise to a number of questions. Nevertheless, the jury was able to reach guilty verdicts on both counts, indicating they found the witnesses credible enough to accept their testimony and reject Ms. McKithern's testimony suggesting McKithern was at home all night. Therefore, this assignment of error lacks merit.

### (2) Habitual Offender Cleansing Period

McKithern argues the State failed to prove the ten-year cleansing period had not elapsed between his prior manslaughter conviction and his convictions in this case. At the sentencing/habitual offender hearing, McKithern argued against the habitual offender adjudication because the State did not sufficiently identify McKithern as a prior felon. McKithern did not formally object after the trial judge pronounced him to be a second habitual offender. McKithern objected to the sentence the trial judge originally pronounced. After a lengthy discussion, both on and off the

record, and several attempts to correctly calculate the habitual offender sentence, McKithern objected to "those findings." On appeal, McKithern contends the State failed to prove the required ten-year cleansing period had not lapsed, even though he did not unequivocally preserve that argument for appeal in the trial court.[1]

In *State v. Carter*, 08-1469, p. 5 (La.App. 3 Cir. 6/3/09), 12 So.3d 1091, 1094, *writ denied*, 09-1521 (La. 3/5/10), 28 So.3d 1004, the "[d]efendant argue[d] for the first time on appeal that the State did not prove ten years had not elapsed between his release from State custody and the current conviction." The defendant did not file a motion to quash the multiple offender bill, and he failed to object because the State failed to prove the cleansing period had not lapsed. This court held the issue was not preserved for appeal and was not properly before the court. Nevertheless, where "the interest of justice clearly requires otherwise," an appellate court may consider an issue not submitted to the trial court. Uniform Rules—Courts of Appeal, Rule 1-3.

This court considers McKithern's objection to "those findings" to include the finding that the State had proved his multiple offender status. Even if, arguendo, this is not an objection sufficient to preserve this issue for appeal, this court finds that the interest of justice requires review because McKithern was adjudicated a multiple offender where the State did not prove the ten-year cleansing period had not elapsed.

> The current offense shall not be counted as, respectively, a second, third, fourth, or higher offense if more than ten years have elapsed between the date of the commission of the current offense or offenses and the expiration of the maximum sentence or sentences of the previous conviction or convictions, or between the expiration of the maximum sentence or sentences of each preceding conviction or convictions alleged in the multiple offender bill and the date of the commission of the following offense or offenses. In computing the intervals of time as provided herein, any period of parole, probation, or incarceration by a person in a penal institution, within or without the state, shall not be included in the computation of any of said ten-year

---

[1] The multiple offender bill is not included in the record.

9

> periods between the expiration of the maximum sentence
> or sentences and the next succeeding offense or offenses.

La.R.S. 15:529.1(C). The State bears the burden of proving the cleansing period has not elapsed in cases where more than ten years have passed between a defendant's release from custody and the present felony. *State v. Samuel*, 08-100 (La.App. 3 Cir. 5/28/08), 984 So.2d 256, *writs denied*, 08-1419, 08-1487 (La. 2/20/09), 1 So.3d 493, 495 (citing *State v. Thomas*, 05-2210 (La.App. 1 Cir. 6/9/06), 938 So.2d 168, *writ denied*, 06-2403 (La. 4/27/07), 955 So.2d 683). The "expiration of the maximum sentence" language of La.R.S. 15:529.1 equates with the date of discharge from parole supervision. *Samuel*, 984 So.2d 256 (citing *State v. Gamberella,* 633 So.2d 595, 607 (La.App. 1 Cir. 1993), *writ denied*, 94-200 (La. 6/24/94), 640 So.2d 1341). This court upheld the *Samuel* defendant's habitual offender adjudication because the State produced evidence of the date of his release from prison pursuant to parole for the remainder of his sentence and, thereby, showed the cleansing period had not lapsed.

> The State bears the burden of showing that the predicate convictions fall within the cleansing period. The imposed sentence does not govern the determination of the expiration of the cleansing period. Rather, the actual discharge from supervision by the Department of Corrections controls. Thus, the commencement of the cleansing period is from the date of discharge from state supervision, because the discharge can take place earlier than the theoretical date on which the sentence would have terminated due to pardon, commutation or good time credit, or it could take place later because of parole revocation. (Citations omitted).

*State v. Humphrey*, 96-838, pp. 13-14 (La.App. 5 Cir. 4/29/97), 694 So.2d 1082, 1088, *writ denied*, 97-1461 (La. 11/7/97), 703 So.2d 35. McKithern pled guilty to manslaughter in Plaquemines Parish on March 8, 1988, and was sentenced to eighteen years at hard labor. The State did not show whether the date of discharge was actually eighteen years from conviction or an earlier or later date. Accordingly, the State did not prove the ten-year cleansing period had not elapsed, and McKithern's habitual offender adjudication is set aside.

10

## (3) Case Theory

McKithern argues the trial court erred when it sustained the State's objection and denied him the right to present his theory that the fire occurred as a consequence of a methamphetamine laboratory. The record shows McKithern did not attempt to introduce any such evidence. The defense offered the testimony of only one witness, Reva McKithern, and then rested. Ms. McKithern's testimony did not address the subject of a possible methamphetamine laboratory.

Only in closing arguments did McKithern attempt to raise the possibility that Green's testimony about McKithern and Smith's leaving the party for a period of time was not only for the purpose of "getting messed up, but they were getting chemicals and other stuff for a clandestine lab." No evidence of such a possibility was presented, and the court sustained the State's objection during McKithern's closing statement for that reason. This assignment of error lacks merit.

## (4) Ineffective Assistance of Counsel

McKithern claims his trial counsel was ineffective because he failed to object to, allegedly, hearsay testimony about Gerald Endicott, who was not present at trial. Endicott's name was mentioned numerous times at trial; McKithern asserts it was mentioned ninety-six times. Additionally, photographs of Endicott were admitted into evidence without objection. Detective Jason Gertz testified they fairly and accurately depicted what he observed.

The issue of ineffective counsel is more appropriately addressed in an application for post-conviction relief, where an evidentiary hearing can be conducted in the trial court. *State in the Interest of A.B.*, 09-870 (La.App. 3 Cir. 12/9/09), 25 So.3d 1012. Yet, where an ineffective assistance claim is raised on appeal, this court may address the merits of the claim if the record discloses sufficient evidence to rule on it. *Id.* If this court considers this claim on appeal, McKithern must satisfy a two-

part test when making a claim of ineffective assistance of counsel. He must show that counsel's performance was deficient, and that the deficiency prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984).

The record fails to reveal where witnesses testified about out-of-court statements Endicott made to prove the truth of the matter at issue. Rather, the witnesses testified about what they saw Endicott do and why they believed he did it. They testified about what they personally observed.

McKithern further complains his counsel did not call particular witnesses to testify at trial and, thereby, his rights under the Confrontation Clause were violated. The decision to call or not call witnesses is a matter of trial strategy and does not necessarily indicate counsel's ineffectiveness. *State v. Stringer*, 06-800 (La.App. 3 Cir. 12/6/06), 949 So.2d 464, *writ denied*, 07-4 (La. 9/14/07), 963 So.2d 996. McKithern has not shown how calling any of these witnesses would have changed the outcome of the trial.

The record on appeal sufficiently shows counsel was not ineffective. This argument lacks merit.

### (5) **Jury Instructions**

McKithern alleges the trial court deprived him of his rights to due process and a fair trial by not including a definition of "reasonable doubt" in its jury instructions.

The trial court instructed the jury:

> While the State must prove guilt beyond a reasonable doubt, it does not have to prove guilt beyond all possible doubt. Reasonable doubt is doubt based on reason and common sense and is present when, after you have carefully considered all the evidence, you cannot say that you are firmly convinced of the truth of the charge.

12

In *State v. Williams*, 96-1023 (La. 1/21/98), 708 So.2d 703, *cert. denied*, 525 U.S. 838, 119 S.Ct. 99 (1998), the Louisiana Supreme Court considered a jury instruction that stated, in part:

> Now while the State must prove guilt beyond a reasonable doubt, the State does not have to prove guilt beyond all possible doubt. Reasonable doubt is doubt based upon reason and common sense, and it's present when after you've carefully considered all of the evidence you cannot say that you are firmly convinced of the truth of the charge.

*Id.* at 717, n. 9. The court held this and other language from the instruction concerning reasonable doubt was not a constitutional violation.

Additionally, this court has found that the language of the instruction given to the jury here "adequately informed the jury that the defendant was presumed innocent until proven guilty and was entitled to the benefit of any reasonable doubt." *State v. Watts*, 596 So.2d 306, 310 (La.App. 3 Cir.), *writ denied*, 599 So.2d 316 (La.1992). This part of McKithern's assignment of error lacks merit.

McKithern also contends the trial court erred by failing to instruct the jury on the lesser responsive verdict of aggravated arson. The record does not indicate McKithern requested any different jury instruction or made any objection to the charge given. The trial judge instructed the jury: "[t]here are no lesser responsive verdicts to the crime of aggravated arson. Therefore, in response to the charge of aggravated arson, the following verdicts may be returned: 1, guilty of aggravated arson; 2, not guilty." The responsive verdict to a charge of aggravated arson includes simple arson only where "the words 'belonging to another and with damage amounting to _____ dollars' are included in the indictment." La.Code Crim.P. art. 814(30). Otherwise, the only responsive verdicts are "guilty" and "not guilty." McKithern's indictment fails to include the language required to warrant simple arson as a responsive verdict. Thus, the trial court's jury instruction was correct as it applied to this case.

13

## (6) Counsel's Failure to Object to Jury Instructions and to Move to Quash the Indictment

McKithern alleges his counsel was deficient for not objecting to the jury instructions concerning responsive verdicts. As discussed above, the jury instructions did not misstate the law. McKithern further argues his counsel's deficient performance was in failure to move to quash the indictment as being defective on its face. He contends he was prejudiced by this deficient performance.

The indictment states McKithern "committed aggravated arson of a dwelling, structure, water craft of movable, to wit: 2101 Pujol Road, Lot 808, Lake Charles, Louisiana, wherein it was foreseeable that human life was endangered." McKithern seems to allege the indictment is defective because it fails to include the words "belonging to another with damage amounting to _____ dollars."

"Aggravated arson is the intentional damaging by any explosive substance or the setting fire to any structure, watercraft, or movable whereby it is foreseeable that human life might be endangered." La.R.S. 14:51. The wording of the indictment contains the elements of the statute, and the language McKithern would have included in the indictment is not required. Because McKithern has not alleged a valid basis for a defective indictment, he has failed to allege a basis for counsel's ineffectiveness. This assignment of error lacks merit.

## (7) Recusal

McKithern contends the trial judge should have recused himself according to La.Code Crim.P. art. 671(A)(5) and (6). That article provides a judge "shall be recused when he: (5) Has performed a judicial act in the case in another court; or (6) Would be unable, for any other reason, to conduct a fair and impartial trial."

McKithern has identified no other court in which the trial judge presided in any matter involving him. McKithern contends the trial judge was biased because

14

he could have empaneled the grand jury that indicted McKithern, he issued an arrest warrant and set McKithern's bond, and he presided over a bond-reduction hearing.

McKithern further contends these actions showed the "real possibility that [the trial judge] had already formed an opinion as to [McKithern]'s guilt." We note this was a jury trial, not a bench trial. The trial judge was not the finder of fact, and it was the jury that found McKithern guilty.

McKithern also alleges the trial judge failed to correct a statement by the State's attorney during voir dire, that "every defendant is presumed guilty until proven innocent beyond a reasonable doubt . . . ." No objection was made to this mistake, and no attempt to correct it was made. Throughout the voir dire and during the jury charge, the jury was told the proper standard. McKithern has not shown any prejudice by this remark.

McKithern complains that his witnesses were subjected to sequestration while the State's witnesses were not, resulting in the parties being treated dissimilarly. Yet, he fails to cite a single instance where any witness behaved in a manner that would have violated a sequestration order had it been given. Although Green indicated he saw Smith in the hallway at trial for the first time since the incident, McKithern fails to show they spoke of anything that should not have been discussed. Moreover, no further request for sequestration of witnesses was made after the first part of the trial.

Continuing with grounds for his argument for recusal, McKithern claims the trial judge showed bias and prejudice against him by "directing the defense counsel's line of questioning to irrelevant questions allowable by the court." In fact, the portions of the record cited by McKithern reflect a sidebar conference in which the trial judge indicated testimony sought by defense counsel was irrelevant, and he did not allow it as stated. The trial judge did, however, allow the defense to elicit testimony that Ms. McKithern's dogs did not wake her the night of the incident.

McKithern fails to show how the prohibited testimony overcame the problems of irrelevance and speculation.

McKithern next assumes the trial judge had improper contact with a juror named "Abby" because of comments he made concerning a conversation with someone by that name. He fails, however, to identify any juror as "Abby."

Based on discussion of the verdict form by counsel and the trial judge, McKithern alleges another constitutional violation. When the jury presented its verdict, the trial judge was concerned that it might not be in proper form. Counsel for both the State and McKithern saw no problem with the verdict form. The verdict form was signed by the foreperson below statements indicating the jury found McKithern guilty of each charge, and on an additional page, a jury representative had written an indication of guilty of each charge. McKithern has submitted nothing to suggest bias or prejudice by the trial court regarding the form of the verdict. None of the other portions of his argument indicates the necessity for a recusal.

IV.

## CONCLUSION

For the reasons above, this court affirms McKithern's convictions, vacates McKithern's adjudication and sentences as a habitual offender, and remands the matter for further proceedings to determine McKithern's habitual offender status and for resentencing. The trial court is instructed to notify McKithern of the provisions of La.Code Crim.P. art. 930.8 at resentencing.

**CONVICTIONS AFFIRMED. HABITUAL ADJUDICATION VACATED; REMANDED.**

16