NOT DESIGNATED FOR PUBLICATION

**STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT**

**KA 20-170**

**STATE OF LOUISIANA**

**VERSUS**

**CHRISTOPHER MICHAEL VACCARO**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTY-FIRST JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON DAVIS, NO. CR-647-18
HONORABLE CRAIG STEVE GUNNELL, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**BILLY HOWARD EZELL
JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Billy Howard Ezell, and D. Kent Savoie, Judges.

**AFFIRMED.**

**Annette Fuller Roach**
**Louisiana Appellate Project**
**P. O. Box 1747**
**Lake Charles, LA 70602-1747**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Christopher Michael Vaccaro**

**Michael Cade Cassidy**
**District Attorney - 31st Judicial District Court**
**P. O. Box 1388**
**Jennings, LA 70546**
**(337) 824-1893**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **State of Louisiana**

**Robert Leyton Odinet**
**Mahtook & LaFleur, LLC**
**P. O. Box 3089**
**Lafayette, LA 70502-3089**
**(337) 266-2189**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **State of Louisiana**

**EZELL, Judge.**

Defendant, Christopher Michael Vaccaro, was charged with aggravated assault with a firearm, a violation of La.R.S. 14:37.4, on September 19, 2018. The charged incident occurred on July 21, 2018. Defendant pled not guilty.

A jury convicted Defendant of the lesser offense of attempted aggravated assault with a firearm, a violation of La.R.S. 14:27 and 14:37.4, on July 24, 2019. Defendant filed a motion for new trial on September 25, 2019. The motion alleged the trial court erroneously refused to admit cell phone records into evidence because Defendant did not have an expert from the phone company to explain them. It further alleged the trial court erroneously allowed into evidence a weapon that was unrelated to the incident but fit a holster matching a description by witnesses on the night of the incident. The trial court denied the motion on September 27, 2019.

On September 30, 2019, the trial court filed written reasons for sentencing. The reasons stated the trial court was sentencing Defendant to serve two years in the parish jail with all but six months suspended. The trial court also ordered Defendant to be on supervised probation for two years with these special conditions: 1) pay a $2,000 fine; 2) attend and complete anger management courses; 3) do not own and/or possess a firearm for ten years; 4) pay $150 to the Department of Probation and Parole for the cost of the pre-sentence investigation; and 5) comply with all other conditions of La.Code Crim.P. art. 895.

However, on the same date, the trial court announced at the sentencing hearing it was imposing a term of two years in the parish jail with all but one year suspended. The trial court also imposed a $2,000 fine plus court costs and ordered these special conditions: 1) pay $150 for the pre-sentencing report; 2) pay all fines, fees, and costs within the first eighteen months of probation; 3) complete and attend an anger

management course; 4) submit to an addictive disorder clinic; 5) not possess or own a firearm for ten years; 6) pay a $60 supervision fee each month; 7) follow all other conditions of probation set out in La.Code Crim.P. art. 895; and 8) have no contact with "the three gentlemen and/or their family [sic]" during the probationary period.

Defendant filed a motion to reconsider his sentence on October 30, 2019, alleging multiple reasons the sentence was excessive. The trial court denied the motion the same day without a hearing and without comment. Defendant now seeks review of his conviction and sentence.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find none.

## ASSIGNMENT OF ERROR NUMBER ONE

Defendant contends the evidence introduced at trial, when viewed under the standard of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979), was insufficient to prove, beyond a reasonable doubt, all of the elements of either attempted aggravated assault with a firearm or aggravated assault with a firearm. The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007) (citing *Jackson*, 443 U.S. 307; *State v. Captville*, 448 So.2d 676, 678 (La.1984)). The *Jackson* standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521 (citing *State v.*

2

*Robertson*, 96-1048 (La. 10/4/96), 680 So.2d 1165; *State v. Lubrano*, 563 So.2d 847, 850 (La.1990)). The appellate court's function is not to assess the credibility of witnesses or to reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442.

The fact finder's role is to weigh the credibility of witnesses. *State v. Ryan*, 07-504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. Thus, other than insuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at 1270 (quoting *State v. Lambert*, 97-64, p. 5, 720 So.2d at 724, 727). Our supreme court has stated:

> However, an appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall,* 523 So.2d 1305, 1310 (La.1988). In determining the sufficiency of the evidence supporting a conviction, an appellate court must preserve "'the factfinder's role as weigher of the evidence' by reviewing 'all of the evidence . . . in the light most favorable to the prosecution.'" *McDaniel v. Brown,* 558 U.S. [120, 134], 130 S.Ct. 665, 674, 175 L.Ed.2d 582 [(2010)](quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). When so viewed by an appellate court, the relevant question is whether, on the evidence presented at trial, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789. Applied in cases relying on circumstantial evidence, . . . this fundamental principle of review means that when a jury "reasonably rejects the hypothesis of innocence presented by the defendant[ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville,* 448 So.2d 676, 680 (La.1984).

*State v. Strother*, 09-2357, pp. 10-11 (La. 10/22/10), 49 So.3d 372, 378 (first and fifth alterations in original).

"Aggravated assault with a firearm is an assault committed with a firearm." La.R.S. 14:37.4(A). "Assault is an attempt to commit a battery, or the intentional

placing of another in reasonable apprehension of receiving a battery." La.R.S. 14:36. "Battery is the intentional use of force or violence upon the person of another[.]" La.R.S. 14:33. An attempt is the commission or omission of "an act for the purpose of and tending directly toward the accomplishing of his object[.]" La.R.S. 14:27(A).

After dark on July 21, 2018, employees of Big South Inflatables arrived at Defendant's home to pick up a fun jump. They exchanged words with Defendant and others before they left the scene without getting the jump. When a second truck arrived, events culminated with Defendant pointing a gun at the victim. Numerous witnesses testified at trial from both sides of the situation.

*Deputy Tyler Breaux*

Deputy Breaux of the Jefferson Davis Parish Sheriff's Office investigated the July 21, 2018 incident. He testified the Iowa Police Department contacted his office to meet at the Lacassine substation around 11:00 p.m. that night. Deputy Breaux spoke to the owner of Big South Inflatables, Ryan Monceaux, and the victim and took statements from the victim, T.K., and from witnesses, Seth Touchet and Gene Natali.[1] Deputy Breaux's body cam recorded the interviews at the substation. Deputy Breaux also obtained written statements from the victim and the witnesses that night.

The body cam video showed Deputy Breaux's contact with the victim, the victim's father, and Mr. Monceaux after the incident. The victim's father was upset because other employees of Mr. Monceaux had placed his son in jeopardy. Mr. Monceaux told Deputy Breaux an employee, Aaron Murillo, had been at

---

[1]The victim's initials are used pursuant to La.R.S. 46:1844(W) because he was a minor at the time of the incident.

4

Defendant's house and left the scene very quickly, and the victim arrived soon afterward. Mr. Monceaux thought Defendant believed he was confronting Mr. Murillo again when the victim arrived in the second truck.

The victim told Deputy Breaux he could not back into the driveway and had to go around the block. On his second approach, Defendant tapped on the truck with a gun and put it in the victim's face when the victim lowered the window. The victim said Defendant thought Mr. Murillo had returned until his wife said the victim and his truck's occupants were not the same people.

Defendant had the victim get out of the car and call Mr. Murillo and Mr. Monceaux. Mr. Murillo said Defendant had shut the truck door on him and had "popped him in the face." Defendant wanted the victim to tell Mr. Monceaux to fire Mr. Murillo. Defendant tapped the victim on the chest and told the victim he would "take it out" on the company if Mr. Murillo returned. The victim defused the situation and apologized for Mr. Murillo's actions. Defendant let the victim retrieve the jump.

The body cam video also showed that Mr. Natali told Deputy Breaux that Defendant pulled a gun on the victim. Mr. Natali said Defendant told them "either get off my property or I'll shoot."

Deputy Breaux and his supervisor then went to the scene on Ava Lane to try to locate someone from the earlier gathering. They spoke to Craig Ardoin, who told them "a few things on his side of what he witnessed or what he saw." Because of the late hour, they decided not to try to contact any other witnesses at that time.

When Deputy Breaux went to Defendant's home the next day, no one answered the door. Deputy Breaux ran the license plate on a vehicle parked at the

residence, and it was registered to Defendant. He completed an incident report and forwarded it to detectives. The case was assigned to Detective Travis Savoy.

*Detective Travis Savoy*

Detective Savoy of the criminal investigations division of the Jefferson Davis Parish Sheriff's Office prepared an extensive report of the investigation of this incident. He first reviewed Deputy Breaux's report and then requested a photographic lineup on July 26, 2018, that included Defendant and five others with similar facial features and hair. Mr. Touchet and Mr. Natali chose Defendant from the lineup. The victim was unable to identify Defendant, but he narrowed the group of photographs to three. The group of the three possible suspects included Defendant's photograph. Mr. Touchet, Mr. Natali, Aaron Murillo, and the victim gave recorded interviews on July 26, 2018.

Defendant was arrested on July 27, 2018, and Detective Savoy attempted to interview him on July 30, 2018. Detective Savoy testified Defendant refused to cooperate. He attempted to contact Mr. Ardoin, but neither Mr. Ardoin nor his wife would return the detective's calls. Thus, Detective Savoy, who testified "[t]here's [sic] two sides to every story[,]" was unable to determine the identity of the other men at the scene of the incident or determine their sides of the story.

On July 30, 2018, after Defendant refused to be interviewed, Detective Savoy obtained a search warrant of Defendant's home and vehicle to locate the revolver the victim and the witnesses had described and the black nylon holster the victim had photographed on the night of the incident. The victim had stepped on the holster in the yard as he was loading the fun jump. A search of Defendant's home yielded the holster, which held an "old time semiautomatic-type pistol," but not the revolver.

6

Detective Savoy contacted Mr. Murillo and Cade Brown, who had been to Defendant's home just before the victim, Mr. Touchet, and Mr. Natali arrived. They told Detective Savoy "there was a heated exchange of – of words. They were there to pick up a fun jump, and [Defendant] did not allow them to pick up their fun jump."

*Aaron Murillo*

Mr. Murillo was seventeen years old at the time of the incident; he gave a video interview that was shown to the jury. At the time of the video, Mr. Murillo already knew of the aggravated assault with a firearm charge. The victim had called Mr. Murillo from the scene. He later told Mr. Murillo he was held hostage by more than one person and had a gun held on him when he had called Mr. Murillo.

In the video, Mr. Murillo said he and another employee arrived around 9:30 that night. Defendant met him and told them to leave. Another man appeared, but he was nice. Mr. Murillo said both men were drunk, and Defendant was cursing at him. Mr. Murillo called Mr. Monceaux, but Defendant said he did not want to talk to him.

The video showed Mr. Murillo say he was halfway out of the truck when Defendant grabbed the door, and Mr. Murillo, who had become angry by that time, pushed it back on Defendant. Mr. Murillo and Defendant were cursing at each other as Defendant kicked the right front bumper of Mr. Murillo's truck, and six more people came outside. Mr. Murillo agreed his 2008 cream vanilla truck and the victim's gray GMC Sierra truck could look similar in the dark.

At trial, Mr. Murillo testified he was driving a 2008 "vanilla white" Dodge Ram the same size as the gray or silver GMC Sierra truck the victim drove that night. The truck's headlights were on, and one other person was in the truck with Mr.

7

Murillo. Mr. Murillo saw four or five men and women in the back yard in addition to Defendant.

Mr. Murillo did not recall if he told the victim the property owner had told him to leave. He thought the victim arrived about thirty minutes to an hour later.

Mr. Murillo had never seen Defendant before that night. When he arrived at Defendant's home around 9:30 p.m., Defendant "came off nice at first." He asked Mr. Murillo why they were there, and he told Mr. Murillo he would not allow them to pick up the fun jump that late. Mr. Murillo asked if Defendant wanted him to call his boss, but he said nothing mean, antagonistic, or threatening to him.

After Defendant asked Mr. Murillo to leave, Mr. Murillo got in the truck. Defendant knocked on the truck's window while Mr. Murillo was on the phone, and Mr. Murillo opened the door. Mr. Murillo said Defendant "told us to get the F out of his driveway and asked me if I knew how to drive, like basically telling me to back up right now[.]" Mr. Murillo admitted he was halfway out of his vehicle after Defendant told him twice to leave because Defendant "was still talking to [him], and he's being extremely rude and being aggressive." He denied being aggressive toward Defendant.

The situation became hostile when Defendant tried to shut the vehicle door on Mr. Murillo while he "was still hanging out of the vehicle, half [his] body [was] hanging out of the vehicle[.]" Mr. Murillo grabbed the door and pushed it back. Had he not done that, the door "would have slammed me – it – I'd have gotten slammed in my door, my leg, my – something." He became angry at that point, and things escalated between them. Mr. Murillo would not say Defendant became aggressive, but he testified, "I was basically protecting myself. I felt like he might do something." Mr. Murillo and Defendant cursed at each other, but Mr. Murillo

8

never pushed, hit, or threatened Defendant. He did, however, tell Defendant he "was going to beat him up" and was going to "beat his ass."[2] They talked some more, and eventually Mr. Murillo left.

Mr. Murillo also spoke to "some big guy" who "was actually nice and never came off aggressive," and he argued with "a little guy." Mr. Murillo had no doubt violence would have occurred had he exited his vehicle as he backed out of the driveway. The entire encounter lasted no longer than five minutes; the victim and Mr. Natali were unaware of it when they arrived.

Mr. Murillo never told Defendant he planned to return to Defendant's house, and he in fact did not return. He did not back into the mailbox, but his vehicle's front left tire went into the grass as he drove forward into the driveway.

*Seth Touchet*

Mr. Touchet was a seventeen-year-old high school student at the time of this incident. He gave a written statement at 11:53 p.m. on the night of the incident. The statement said "this dude" pulled a gun on them, saying they could not pick up the fun jump because of the late hour.[3] It said "[t]he people there" thought Mr. Touchet and those with him were the same ones who had been there earlier.

A video of Mr. Touchet's recorded statement on July 26, 2018, was played for the jury. Mr. Touchet described how Defendant ran around their truck and put a gun in the window, pointing it at the victim from about one foot away. Defendant and the others with him thought Mr. Touchet was one of those who had been at the

---

[2]Mr. Murillo testified he is five feet ten inches tall and weighed one hundred eighty-five pounds. Defendant is shorter than Mr. Murillo.

[3]The statement referenced "this dude," but when Mr. Touchet read the statement to the jury, he said "Chris – Christopher[.]"

scene earlier. After about thirty minutes, Defendant made the victim get out of the truck to go talk to a "group of guys," about six or seven people. The victim was with that group for an hour to an hour and a half. Another man came from the house with a long gun. Mr. Touchet described Defendant as "pretty drunk." Mr. Touchet could smell alcohol on Defendant's breath, and Defendant was slurring his words.

At trial, Mr. Touchet testified the gun involved in the incident was a revolver, but the gun introduced as State's Exhibit S-15 was not it. Mr. Touchet saw the gun in Defendant's hand "[t]he whole time he was up to the window" of the truck. When their truck pulled up in front of the house, Defendant came toward it with the gun in his hand and pointed it at the truck. As Defendant got in front of the truck, "[h]e said do y'all want to try that shit again." Mr. Touchet did not know what Defendant was talking about, and he said they "just froze" and did not know what to do. They were afraid of Defendant.

Defendant next went to the driver's window where the victim was seated and held the gun inside the window, which was rolled down. He pointed the gun at the victim's shoulder area from a distance of about one foot. Defendant told the victim to exit the vehicle and "come over here and talk to the other people." He told Mr. Touchet and Mr. Natali to remain in the truck. Defendant, the victim, and two women walked toward the group of "other people" about one hundred to one hundred fifty feet away at the house next door to the house where the fun jump was located. Six or seven people were in the group.

After about an hour, the victim walked back to the truck alone and said they could get the fun jump. Mr. Touchet saw "a bunch of empty beer cans laying [sic] around" the jump. Defendant came back and spoke to the victim, engaging in "a normal conversation." Defendant no longer had the gun in his hand, and Mr.

10

Touchet never saw it again. Mr. Touchet and the others left the scene and went to the Iowa police station, where Mr. Touchet gave his first statement. He did not know another group had been to Defendant's house before they arrived.

Mr. Touchet testified they never said anything mean or ugly to Defendant. The only time he got out of the vehicle was to get the fun jump. He never saw six or seven armed men or dogs, but he did see someone with a long gun at the house next door to Defendant. Mr. Touchet never called the police or anyone else during the incident because he was afraid the group would do something to the victim if the police came. Even so, they stayed and picked up the jump instead of leaving the scene where they had been so fearful. When asked why he never called his parents or the police after they left, Mr. Touchet responded, "I don't know." He never took any photos or videos during the time the victim was with Defendant and the others.

Mr. Touchet's written statement on the night of the incident mentioned nothing about anyone else having a gun. Mr. Touchet and the victim discussed the incident between the time of Mr. Touchet's written and video statements. Mr. Touchet decided he had seen another gun during the time between the two statements.

*Gene Natali*

Mr. Natali was a sixteen-year-old high school student at the time of the incident. He gave a written statement at 11:44 p.m. that night. He gave a second, recorded statement four or five days later; the video was shown to the jury at trial.

The written statement said the truck first had passed the driveway and "made a loop around" when a man walked up to them with a gun and said they could not come on the property or he would shoot. The man pointed the gun at the victim's

11

face and said they had to leave.  The statement did not mention anyone else present with a gun.

In the video, Mr. Natali said Defendant was getting out of his truck when they arrived, and he came to the window of their truck with a gun.  About a minute later, six or seven others who appeared to have guns gathered at the front and on the side of their truck.  Defendant mostly pointed his gun at the victim, but he also waved it around.  Defendant took the victim to another driveway, pushing him along the way, and made him call Mr. Monceaux and Mr. Murillo.  When the victim returned to the truck, he said to pick up the jump.  They got the jump and left the scene.  Mr. Natali said Defendant looked intoxicated, and Mr. Natali was "pretty scared."

At trial, Mr. Natali explained the victim first backed the truck in and almost went into the ditch.  He did not back into Defendant's mailbox.  He drove around the neighborhood again, came back, and pulled up in front of Defendant's house. Mr. Natali did not recall telling police on the night of the incident that Defendant thought they were other people or that Defendant only pointed the gun at the victim. He did not recall receiving any messages or calls from Mr. Murillo prior to their arrival at Defendant's house.

Mr. Natali testified he was in the passenger seat of the truck when they pulled into Defendant's driveway and saw him going to his truck.  Defendant then approached their vehicle with the gun, "right next to the driver's door."  Mr. Natali said Defendant "pointed [the gun] at all of us, waving it around[,]" and pointed the gun about "[h]alf a foot" from the victim's head.  He testified Defendant told them, "we need to leave, and he said you motherfuckers want to die."  On a scale of one to ten, Mr. Natali's fear was a ten.  He said he never thought to use his cell phone at the scene "[b]ecause of the nerves, and I was scared.  I didn't know what to do."

12

The gun Mr. Natali saw that night was a revolver.  It did not look like the gun entered into evidence as Exhibit S-15.  After Defendant pointed the gun at the victim, Mr. Natali saw six or seven other adults come out of the house after Defendant approached the truck.  Four or five of the men had long guns like rifles.  The men did not point the guns at anyone; they just held the guns about twenty yards away from the truck.[4]  Mr. Natali recalled the other men with guns between the time of his written statement the night of the incident and the time of his videoed statement four or five days later.

Defendant asked the victim to get out of the truck, and the group took the victim to the other driveway.  Mr. Natali said "it didn't look like [the other men] had the guns anymore[,]" but he did not know what they had done with them.  He saw the group shoving and pushing the victim.

The group kept the victim "[t]wenty, 30 minutes" before the victim returned to the truck and said they could get the jump.  Mr. Natali, Mr. Touchet, and the victim left after getting it without doing anything threatening toward anyone.  The victim called Mr. Monceaux and drove through Iowa.  A police officer pulled them over because their lights were not on, and they told him about what had happened.  They never spoke to Mr. Murillo or received messages from him prior to their arrival at the location.

*T.K., the victim*

The victim was a seventeen-year-old high school junior working for the fun jump company during the summer at the time of this incident.  He was in charge of putting the crews together on the night of the incident, and the crews were confused

---

[4]Mr. Natali later testified the group took the victim about thirty yards away from the truck.

about who was to pick up the jump. The victim, not Mr. Murillo, was supposed to get it.

The victim's written statement, given that night, described how he could not back in at Defendant's house, so he made the block. Defendant pulled a revolver on him that looked like "a double action 44[,]" put it in the victim's face, and said, "do you wanna [sic] fucking die. I will kill you. What now bitch?" The statement said "they" made the victim park the truck and get out while the others remained in the truck. "They" had the victim "figure out who came to the house before," and the victim called him and their boss. "They" made the victim tell his boss to fire the other person. The victim's statement said "there were for sure three or four pistols and maybe a rifle." The victim said they told him he talked his way out of death. They understood the person who came before the victim "messed up," and the victim did not know of it. The statement said, "[T]hey were strapped with riffles [sic], pisols [sic] [,] dogs, oh and they are drunk."

The victim gave a videoed statement on July 26, 2018, that was played for the jury. In that video, the victim said he stepped on the holster behind Defendant's truck on the driveway. He took a picture of it, picked it up, and handed it to Defendant, who then put it in his truck.

At trial, the victim said Defendant forced him out of the truck. Defendant kept saying they had been there previously, and the victim "had to prove we didn't go there so we can leave." Defendant thought the victim was Mr. Murillo. The gun Defendant pointed at the victim was a revolver; the holster admitted into evidence was the one the victim saw that night, but the gun admitted into evidence was not.

The victim was driving a silver gray 2007 GMC Sierra SLE, and Mr. Murillo had been driving a "vanilla with black in the front" four-door Dodge 1500. The

victim stopped his vehicle in the middle of the road in front of Defendant's driveway. Another person holding a firearm ran up to the passenger side of the victim's vehicle. The victim testified he begged to leave the scene because he thought they were going to shoot him.

As Defendant held the gun on the victim, he said, "I'm going to fucking kill you. Are you ready to die? What now?" The victim and the others with him never did or said anything threatening to Defendant. Defendant held the gun inside the vehicle, pointed at the victim, for about thirty minutes. Four or five other people were present, and the victim saw three guns. The others repeated what Defendant said, that the victim was going to die. A neighbor's wife warned the victim not to wake her one-year-old child. During the incident, the others would walk away "and then just come back out of nowheres [sic]." One of the men grabbed the victim by the shoulder and spun him around.

When the victim got out of his truck, the group took him part of the way up the driveway. They again threatened to kill him, and Defendant poked him with the gun. Defendant had the victim call Mr. Murillo two to four times to try to pick a fight with him. When they got Mr. Murillo on speaker phone, they realized he was not the victim, and "they stopped acting like they were, but they were still like being – acting the same, just not as bad."

Ultimately, Defendant told the victim to take the fun jump. When the victim and Defendant went to get the fun jump, Defendant had the gun in his pocket and was no longer pointing it at the victim.

Mr. Monceaux called the victim repeatedly as the victim was leaving Defendant's house, but the victim declined the calls because "[t]he people were still outside right there." The victim then called Mr. Monceaux. He never called police.

15

However, police stopped the victim's vehicle after they left Defendant's house because his trailer lights were not working.

The victim was later unable to identify Defendant in the photo lineup; he told Detective Savoy he did not think Defendant was there. He said he "couldn't make out which one was which, and I didn't want to give the wrong one."

*Ryan Monceaux*

Mr. Monceaux, the owner of Big South Inflatables, explained Saturday fun jump rentals are picked up on Saturday evening or early Sunday morning. The contract with Defendant (signed by his wife) stated the fun jump would be picked up on Saturday around 7:30 p.m., but no later than 11:00 p.m.

On the night of this incident, Mr. Monceaux had two crews picking up jumps. Mr. Murillo ran one crew, and the victim ran the other one. They were working in the same area. Mr. Murillo went to Defendant's home and "had an altercation." Mr. Monceaux guessed "they exchanged words." Mr. Murillo called Mr. Monceaux and told him about what had happened. Based on what Mr. Murillo told him, Mr. Monceaux had the impression Defendant "was under the influence[.]" Mr. Monceaux said Mr. Murillo told him Defendant "was very, very aggressive . . . towards him with the words." Mr. Murillo did not mention Defendant thought they were picking up the jump too late. Mr. Monceaux told Mr. Murillo to "come back to the shop and get off the job." He made no attempt to contact the victim, and neither Defendant nor the victim contacted him. Had Defendant contacted him, Mr. Monceaux testified they "could have handled it way different." However, he later testified the victim called him to say he was trying to get the fun jump, and he was the only one "they let out of the truck . . . the other two guys had to stay, you know, at the truck." The victim said Defendant demanded Mr. Murillo be reprimanded or

16

fired. Mr. Monceaux said the victim "seemed like he was in distress." After the victim hung up from the call, Mr. Monceaux repeatedly called him, but the victim did not answer. Nevertheless, Mr. Monceaux never called the police. After police stopped the victim's vehicle, Mr. Monceaux met the victim and the police at the Iowa City Hall.

Mr. Monceaux did not intend or foresee for both groups to go to Defendant's house. When Mr. Murillo told him of the problems, Mr. Monceaux "thought it was over with."

Defendant and the defense witnesses testified about a completely different set of facts.

*Megan Monteith*

Ms. Monteith and her husband had been Defendant's neighbors for three years at the time of the incident. Around 7:30 p.m., Mr. and Ms. Monteith, their three-year-old child, Cassie and Derek Pearson, and Defendant and his wife gathered at the Pearsons' home because the Monteith child saw a slide there and wanted to play. Two separate birthday parties had taken place earlier, one at the Pearsons' home and one at Defendant's home, but they were both over when the Monteiths arrived. Ms. Monteith did not see any alcohol, and she did not smell alcohol on Defendant's breath. He did not seem impaired to her.

When a truck arrived after dark, Defendant approached it with Mr. Monteith, Mr. Pearson, and Craig Ardoin "standing back." She did not approach the vehicle, and she did not hear anything that was said. The truck was parked in Defendant's driveway "like ten or so minutes." About five minutes after that truck left, a second truck arrived, but Ms. Monteith thought it was the same truck at the time.

17

The second truck went around the second street of the U-shaped neighborhood and passed Defendant's house. It backed up and hit the mailbox; Ms. Monteith heard a "bang like something was hit." Defendant went to the driver's side of the truck and spoke to the driver for "[t]hirty seconds." The victim exited the truck, and the group walked to the end of the Pearsons' driveway, where they all talked.

Ms. Monteith did not have a firearm, and she did not see anyone else with one. However, Ms. Monteith later testified she could not tell whether Defendant had a gun. She did not see anyone push, shove, or put their hands on the victim.

When the group realized the victim was not the first driver, the victim said he was sorry that had happened to them, he could "have that guy's job[,]" and said Mr. Murillo "was not a good guy." The victim called Mr. Monceaux, told him what had happened, and said, "[h]e needs to go."

The first driver then called the victim, and Ms. Monteith heard him say, "I was going back to kick their asses." He hung up on the victim, and the group "just had a normal conversation after that." Defendant told the victim, "since you were so nice to us and you were good, go ahead and get the jump, but keep it down 'cause my children are sleeping." The victim got the jump and left, and the Monteiths went home. The victim never seemed distressed while he spoke to Mr. Monceaux. When asked about the conversation with the victim, Ms. Monteith described, "[a] friendly conversation about what happened in the first truck, and he just kept apologizing that he's sorry that it happened, and that he's just not a good guy. He kept, you know, throwing that first guy under the bus."

*Will Monteith*

Mr. Monteith went to the Pearsons' home around 6:00 or 6:30 p.m. Defendant and his wife joined them. The Monteiths stayed for five to five and a half hours, and

18

Mr. Monteith had two or three beers during that time.  He thought he saw Defendant consume "just maybe a beer or two" during that time.

After dark, they saw "lights and a trailer pulling around the neighborhood shining flashlights into people's yards at their houses and that raised some suspicion for us."  The vehicle pulled in front of Defendant's house, "paused for a moment, and then pulled into the driveway."  Defendant went to talk to the driver, and Mr. Monteith and Mr. Pearson "h[u]ng back[.]"

Defendant told the driver "it was late, and they need to come back in the morning."  Mr. Monteith described Defendant's manner as "[r]espectful."  The driver, however, would not leave, and Defendant "got a little more serious with the situation."  The driver "was propped up outside of his truck.  The door was open, and he was on his phone."  Mr. Monteith approached the truck and "[t]ried to talk some sense into this about what this looked like . . . ."  When the driver went to step out of the truck, Mr. Monteith backed up, and Defendant "blocked his point of exit from the vehicle."  The driver and Defendant "exchanged words . . . . And the guy got in his truck, backed up out of the driveway issuing threats saying he was coming back, and he said I'd beat your ass if your boys weren't here."  The driver then drove away.

Defendant and the others went back to the Pearsons' driveway.  They saw another truck "coming around," and they assumed it "was the same truck, lights, trailer, everything.  It pulled up in front of [Defendant's] house, backed up and hit his mailbox and then sped off."  The truck "made a lap around the neighborhood and came back and stopped in front of [Defendant's] house."

Defendant approached the truck and loudly exchanged words with the victim.  Everyone else stayed in the driveway.  Defendant stood beside the victim's door

"maybe less than a minute, give or take." Things "quieted down pretty quick [sic] [.]"

The victim exited his truck and came into the Pearsons' driveway. He said "the first guy's behavior was inexcusable and that he can get them fired." Mr. Monteith did not see Defendant or anyone else with a firearm, and no one other than Defendant approached the victim's truck. However, Mr. Monteith admitted Defendant was on the opposite side of the vehicle from him, and he could not see what Defendant did. The Monteiths left while the victim and Defendant were standing in the driveway.

Most of the conversation with the victim was about the first truck and the victim's comments about Mr. Murillo. The victim called Mr. Murillo "an asshole" and said he had a temper. Mr. Monteith did not recall much conversation about the jump. No angry words were exchanged, and no one grabbed the victim or had any physical contact with him.

*Cassie Pearson*

The Pearsons lived next door to Defendant and saw Defendant "maybe once every two, three weeks." They and Defendant had birthday parties for their children that afternoon. After they cleaned up from the parties, the Monteiths came over, and they sat around talking at the Pearsons' house. Defendant and his wife were "just chitchatting back and forth."

Ms. Pearson went inside, and when she came back outside, she saw a vehicle at Defendant's house. Defendant was at the vehicle, and Mr. Pearson was walking over to it. She followed him "to see what was going on." Defendant stood beside the vehicle "probably only just a few minutes. Five, ten minutes maybe." One of

the boys exited the vehicle and called the owner of the jump company. They talked for a little while, and the boys left with the jump.

Ms. Pearson never saw Defendant drinking alcohol, and she never saw anyone with a firearm. She never saw anyone yell at the victim or do anything to physically hurt him. She only saw one vehicle.

*Derek Pearson*

Mr. Pearson testified he and his wife, the Monteiths, Defendant and his wife, and Craig Ardoin "hung out for a little bit" at his house after the birthday parties. Mr. Pearson and Defendant both had fun jumps in their yards. When Defendant was at Mr. Pearson's house, he had one glass of an alcoholic beverage.

While the group was standing in Mr. Pearson's driveway around 10:00 p.m., they saw "a truck pull in." They walked over to see who was there; it was someone to pick up the jump. Mr. Pearson and Mr. Ardoin walked back toward Mr. Pearson's house. Defendant and the driver were talking, but "[t]here wasn't any exchange." Defendant told the driver he thought he was too late to pick up the jump, but he was not angry. When Mr. Pearson saw the truck was still there, he went back to the truck.

Defendant was telling the driver he needed to leave and come back the next morning to get the jump, but "[t]he guy didn't want to leave at that time" and was "very persistent." When he tried to exit his vehicle, Defendant "shut the door on him and told him that he needs to get off his property now." The door did not hit any part of the driver's body. The driver "was getting heated" before, but he became mad when Defendant shut the door. Defendant was mad also, but Mr. Pearson "wouldn't say real angry. He got mad."

The driver "got outright – outrate [sic]. He then started cussing at [Defendant], threatening [Defendant] and not wanting to leave." Mr. Pearson told

the driver he thought it best that he leave; Mr. Monteith also said something to him. The driver ultimately left; Mr. Pearson said the driver told Defendant he would "[w]hip his ass" and "he will be back." The group walked back over to Mr. Pearson's house and talked about the danger of "having a kid out there to pick up a jump house at 10:00 at night."

The group then saw "another truck and trailer coming down the road." It backed into Defendant's driveway, hit the mailbox, and drove away. They thought the truck was leaving, but it made the block and came back. Mr. Pearson did not know if this was the same person as the first driver or someone else coming to pick up the jump. Mr. Pearson noticed the truck was a different vehicle after it struck the mailbox.

Defendant "took off walking over there to meet the truck." Mr. Pearson followed him; Defendant "had probably a good 30 to 40 seconds lead, if that." Defendant approached the truck from the driver's side and was there about thirty seconds before Mr. Pearson arrived. Mr. Pearson did not see a firearm.

On cross-examination, however, Mr. Pearson testified he saw Defendant go behind his house. Mr. Pearson lost sight of Defendant. He admitted Defendant could have gotten a gun then, and Mr. Pearson would not have seen him. Mr. Pearson saw only the top of Defendant's head as he approached the victim's truck while Defendant spoke to the victim.

When Mr. Pearson arrived at the truck, Defendant was talking to the victim and explaining the situation. If Defendant had a gun, he would have had to walk to the driver's side of the truck, pull it out, and return it to his pocket within a thirty-second period of time. Mr. Pearson did not see a gun after he arrived at the truck.

All three of the truck's occupants exited the truck, and they walked to Mr. Pearson's driveway, continuing to talk about the first incident. The victim "called the driver of the first vehicle to figure out what happened." No one ever had a firearm or accosted the victim; Mr. Pearson testified, "Nobody had guns." Defendant never yelled at the victim or was ugly to him. The conversation between Defendant and the victim was calm, and Defendant did not raise his voice. Although Mr. Pearson had a German Shepherd dog, he never set it on the victim. No one discouraged the boys from using their phones.

The boys from the truck "seemed shocked about the first situation." The victim said, "[I]t was very unprofessional, and out of his mouth, he said that he would have that boy fired for that." When the victim called the first driver, he told him he was "not suppose [sic] to do things like that. If they tell you to leave, then you leave." The victim was concerned about how the first driver acted. Defendant then let them pick up the jump "being that they were respectable[.]"

Mr. Pearson learned of the charge against Defendant when he saw the news about the arrest. He never went to police with his side of the story because he "thought that was the police job to get – to come to us and ask for our story." Police never contacted Mr. Pearson before or after the arrest and never left a message for him.

In *State v. Lafleur*, 16-467 (La.App. 3 Cir. 1/4/17), 209 So.3d 927, *writ denied*, 17-808 (La. 1/29/18), 235 So.3d 1104, the victim was sitting in his vehicle in a neighbor's driveway while trick-or-treating with his family. The defendant approached him and held a rifle to him for ten to fifteen seconds from a distance of about ten yards. He then lowered the rifle and walked away. The victim feared for his life during the incident and after the defendant left the scene.

23

After the trial court appointed a sanity commission and the defendant was found competent to assist in his defense, a jury found the defendant guilty as charged of aggravated assault with a firearm. On appeal, the defendant argued the evidence was insufficient to support his conviction. This court found the defendant "pointed the rifle at [the victim] with the intent to cause him to be in reasonable apprehension of receiving a battery" and affirmed the conviction. *Id.* at 930.

Here, the jury heard completely opposite versions of what happened that night. No one ever pointed a gun at anyone in the version presented by Defendant's witnesses; indeed, no gun was ever involved at all. This court finds accepting that version would have led to a verdict of not guilty.

In his appellant brief, Defendant contends the evidence did not "support a finding of 'resulting apprehension of harm'" by the victim. The jury obviously accepted the version of the facts presented by the victim and the other State's witnesses. Under that version, Defendant pointed a gun close to the victim's face, had him leave his friends, and had him exit the truck to meet Defendant's group, who may themselves have been armed. The victim testified he thought he was going to die.

We find these facts showed the jury could have reasonably believed Defendant intentionally placed the victim in reasonable apprehension of receiving a battery involving a firearm. Defendant's behavior would very reasonably result in the victim's apprehension of harm. The jury weighed the evidence and made credibility determinations; according to those determinations, we find the evidence was sufficient to convict Defendant of attempted aggravated assault with a firearm. Similar facts in *Lafleur*, 209 So.3d 927, resulted in a conviction of the completed crime.

24

## ASSIGNMENT OF ERROR NUMBER TWO

Defendant alleges the trial court erred when it denied his motion for new trial by excluding evidence of cell phone records and by admitting into evidence a firearm the State's attorney knew was not pertinent to this incident. He alleges the trial court erred in its denial because the verdict is contrary to the law and the evidence. La.Code Crim.P. art. 851(B)(1).

### *Cell phone records*

Defendant complains that the trial court erroneously excluded the AT&T cell phone records of Mr. Natali and Mr. Touchet and the Verizon records of the victim obtained by subpoenas. Prior to trial, Defendant filed a motion asking the trial court to issue subpoenas for the pre-trial production of cell phone records of three witnesses to the incident. The motion limited the production to records reflecting cell phone usage from 8:00 p.m. and midnight on July 21, 2018. The trial court ordered the subpoenas to be issued on May 2, 2018. Defendant furnished copies of the records to the State prior to trial. He contends the State had the opportunity to confirm the authenticity of the records.

At trial, defense counsel argued the straightforward reports did not require expert testimony interpretation; however, he admitted the AT&T reports showed a five-hour differential between the reported Universal Time Coordinated (UTC) and Central Time (CT). Defendant did not have a witness to explain that differential. Rather, defense counsel stated, "[W]e are five hours behind UTC time." He contended the records showed when each call/text began and ended, how long each call/text lasted, and the phone numbers from which they originated and terminated. Thus, they showed calls and texts were made during the time of the incident.

The trial court found the records did not require certification and were not hearsay evidence. However, the trial court had an issue with "the time that you're using, the five-hour differential[.]" It believed "the timeline is the major issue for it to be relevant." The trial court did not allow the records to be introduced into evidence because it refused to "take anybody's word of what – of how to interpret [the records] without an expert." The trial court held it could not admit the records without expert testimony about how to interpret the time difference. Defendant proffered the AT&T cell phone records of Mr. Touchet and Mr. Natali and the Verizon records of the victim.

In *State in Interest of D.J.S.*, 18-239 (La.App. 3 Cir. 9/26/18), 255 So.3d 1177, *writ denied,* 18-1753 (La. 12/17/18), 259 So.3d 339, the juvenile was adjudicated delinquent for making harassing phone calls. An investigator with the Public Defender's Office testified she subpoenaed phone records that were introduced into evidence at the adjudication hearing. She testified about how she contacted AT&T for help with interpreting the records. An unidentified AT&T employee directed her to a website that converted UTC to CT. The investigator testified she made the time conversion "by typing in the date of the offense and using the time converter button[.]" *Id.* at 1182. The trial court commented, "'There was a website, or an app, I think part of the testimony was, used to convert universal time to central time, I guess on the internet. Which brings into question the reliability or the credibility of the documents provided.'" *Id.* at 1188.

On appeal, the juvenile argued the cell phone records contradicted the State's evidence against him and rendered the evidence insufficient to support his adjudication. He argued "the reliability of the cell phone records was not made questionable by the . . . converting of time from UTC to CT as found by the trial

26

court." *Id.* at 1187. This court held the records did not sufficiently contradict witness testimony that the juvenile made the alleged calls and affirmed his adjudication.

Here, the first few pages of Defendant's exhibit identified as "Proffer 1" consist of information about time zones from a website identified as "en.wikipedia.org/wiki/Central_Time_Zone." That information explains how CT is five hours behind UTC during Daylight Savings Time and six hours behind UTC during Standard Time. It also explains how much of the CT zone observes Daylight Savings Time "between mid-March and early November." If this information were true, the records would establish calls/texts were made and received during the incident.

In searching for a definition of Wikipedia, this court located a website identified as "en.m.wikipedia.org." This website's cover page states, "Welcome to Wikipedia, the free encyclopedia that anyone can edit." We find a free website that may be edited by anyone and was not subject to cross-examination at trial does not provide adequate reliability and credibility for a court seeking to provide a proper record on which to base a verdict. This court further notes Defendant's counsel offered no additional explanation of the time differential other than his own unsupported comments.

Further, the proffered AT&T records show only the date, connect time, and length of each communication in UTC. For example, the records show a call was made on July 22, 2018, at 2:04:13 UTC that lasted twenty-six seconds. We find this evidence shows nothing relating to this incident without some type of explanation of the time differential.

27

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." La.Code Evid. art. 401. Even if the trial court had admitted the cell phone records into evidence, Defendant would have had to provide some sort of evidence of the time differential between UTC and CT and how to convert UTC to CT for the evidence to show any connection to this incident. Defendant's Wikipedia website information does not identify the contributor or the date the information was posted. The proffered Wikipedia pages were not subject to cross-examination or verification. We find the pages do not provide sufficiently reliable or relevant information on which to base or contribute to a verdict.

Without the information set out in the Wikipedia pages, Defendant has shown only that calls/texts were made and received as reported in UTC without any method to convert UTC to CT. Thus, he has failed to establish what time the calls set out in the cell phone records were made or received in CT. This court finds the cell phone records have no relevancy to this matter without a connection between the timing of the calls and this incident.

This court indicated its discomfort with witness testimony about time conversion in *D.J.S.*, 255 So.3d 1177. This court is less comfortable with a time conversion in absence of any testimonial or evidentiary support. We find the trial court correctly disallowed the AT&T cell phone records to challenge the credibility of the State's witnesses.

The Verizon records of the victim, however, indicate the time of internet activity, calls, and texts in military-style CT. They show the victim made and

28

received calls between 21:55:48 and 22:32:53 and received text messages from 21:28 to 22:34 on the night of the incident.

Although these records show the times of the calls and texts in local military time, determining the relevancy of the records requires the compilation of significant explanation and data among the pages of the records with the considerable possibility of error. For example, to attempt to determine when just one call was made, one must begin with the information on the page titled "VOLTE Call Detail Explanation Form" and then move to an untitled page that bears the same headings as the explanation page. This in itself requires an assumption that the untitled page, which seems to match the format of the explanation form, indeed lists calls to and from the victim's phone. The Explanation Form contains terminology not explained in the proffered pages or elsewhere in the record. We find even the Verizon records require significant deductions and calculations subject to jury error that raised the level of difficulty regarding the interpretation of the records.

This court finds an expert witness having the "knowledge, skill, experience, training, or education" in the interpretation of the Verizon records would have been able to "help the trier of fact to understand the evidence or to determine a fact in issue[.]" La.Code Evid. art. 702(A). This court further suggests the introduction of the Verizon records in the absence of such an expert witness would have led to unnecessary confusion of the jury. Accordingly, the trial court did not err in denying admission of the records into evidence absent an expert witness to interpret them for the jury.

*Firearm*

Detective Savoy testified about how he obtained a search warrant for Defendant's home and vehicles to look for the revolver and the holster the victim

and the witnesses saw at the time of the incident. When he executed the warrant, he found a black nylon holster containing an "old time semiautomatic-type pistol" on the floor of a gun safe. Detective Savoy testified the weapon was not the revolver the search warrant sought, but he retrieved it because it was "contained inside the holster." At trial, Defendant objected when the State introduced a black holster and a semi-automatic firearm into evidence because the weapon was neither the firearm nor the type of firearm involved in the incident. The trial court overruled the objection and admitted the holster and firearm into evidence.[5]

Detective Savoy testified he found other firearms in the safe including shotguns, a rifle, and other handguns. He did not seize any of those weapons, however, "[b]ecause they were not a revolver." When Detective Savoy did not find a revolver in the house, he moved his search to Defendant's pickup truck. He did not find the revolver in the truck. He spoke with Defendant's wife, who cooperated with him but did not show him a revolver.

Mr. Touchet testified at trial that the firearm introduced into evidence was not the gun he saw on the night of the incident. Likewise, Mr. Natali testified the gun involved that night was a revolver that did not look like the weapon introduced into evidence. The victim himself testified the holster introduced into evidence looked like the one he saw that night, but the firearm introduced was not the one he saw.

Defendant cites *State v. Eaglin*, 18-822 (La. 3/18/19), 265 So.3d 761, where the supreme court vacated the defendant's conviction for second degree murder and remanded the case for a new trial because the trial court erroneously allowed an

---

[5]The trial court ordered the substitution of a photograph identified in the record as S-15 for the actual box containing the black nylon holster and firearm admitted into evidence at trial on July 30, 2019.

inflammatory photograph into evidence at trial. This court found on remand that the photograph's admission into evidence served no legitimate purpose and could not be introduced as evidence of the defendant's bad character. The photograph was taken from a Facebook site and showed:

> The defendant, who was approximately thirteen years old at the time. The photograph falsely portrayed the defendant as a masked armed robber holding a dangerous pistol to the back of a child's head, as though ready to shoot the child. The trial court itself described the photograph as "inflammatory." Later in the trial, the defendant's sixteen-year-old cousin, Latavius Stewart, testified the photograph was taken approximately four years earlier. Mr. Stewart was the boy standing against the wall while the defendant held a BB gun against his head. Another cousin took the photo. Mr. Stewart said they were "[j]ust having fun with it. We were being silly. Just taking pictures."

*State v. Eaglin*, 17-657, pp. 1-2 (La.App. 3 Cir. 7/3/19), 279 So.3d 949, 951(alteration in original). On remand, this court held the jury could reasonably have been negatively influenced by the photograph and related testimony, stating, "The photograph was unsupported by any admissible, relevant evidence and was offered to cast the defendant in a bad light." *Id.* at 956.

Here, witnesses verified the holster introduced looked like the holster they saw that night. The same witnesses consistently and repeatedly testified the weapon introduced was not the firearm they saw that night and was not even the same type of weapon as the one they saw.

We find any perceived prejudice from admitting the holster and firearm and showing it to the jury was negated by the testimony of those witnesses including that of the victim himself. The evidence was not of a type that would unduly and prejudicially influence the jury in light of the evidence and testimony clearly indicating that, while the holster looked like the one from that night, the weapon did not look like the revolver Defendant pointed at the victim. The record shows no

31

reasonable possibility that the admission of the holster and firearm might have contributed to Defendant's conviction. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824 (1967).

Accordingly, we find the cell phone records were properly excluded from evidence at trial. We also find the introduction of the semiautomatic firearm, which testimony clearly showed was not the gun Defendant pointed at the victim, did not unfairly prejudice the jury against Defendant. A "motion for new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied[.]" La.Code Crim.P. art. 851(A). Defendant has not shown such an injustice. Thus, the trial court correctly denied Defendant's motion for new trial.

**ASSIGNMENTS OF ERROR NUMBERS THREE, FOUR, FIVE, AND SIX**

These four assignments of error pertain to sentencing issues. Defendant "adopts the arguments set forth in both the Sentencing Memorandum filed before sentence and the Motion to Reconsider Sentence filed after sentence was imposed." This court has noted:

> The defendant may not incorporate arguments made in the trial court into his appellate brief by reference. *Bennett v. Hughes*, 03-1727 (La.App. 4 Cir. 5/26/04), 876 So.2d 862, *writ denied,* 04-1599 (La. 6/30/04), 877 So.2d 122. Such a reference is insufficient to constitute briefing of this assignment of error. Uniform Rules—Courts of Appeal, Rule 2–12.4[.]

*State v. Eaglin*, 17-657, p. 8 (La.App. 3 Cir. 3/28/18), 239 So.3d at 1001, (reversed on other grounds), 265 So.3d 761. Accordingly, we consider only the arguments set out in Defendant's original and reply briefs in this memorandum.

Defendant argues the trial court erred in considering statements from the other alleged victims and their families when Defendant was never charged with an

offense against those other persons, and the evidence was insufficient to establish a crime had been committed against them. At the sentencing hearing, the trial judge allowed the filing of three statements into the record, noting, "I have a report from Gene Natali, his son, that was – and Aaron and Christi Natali, and the report from Seth Touchet into the record at this time.

"Also, I'm filing into the record the sentencing memorandum that has been submitted, including statements of different individuals[.]" Defendant stated no objection to the filing of those statements or to the trial judge's consideration of them. Thus, Defendant waived his right to object to their filing and consideration. La.Code Crim.P. art. 841(A).

Defendant also argues the trial court erred in considering for sentencing purposes a letter that had been provided to the prosecution as part of the plea-bargaining process. The State introduced the letter at the sentencing hearing on September 30, 2019. Defendant objected to it being used as part of the sentencing. The court noted the letter was undated but was written by Defendant prior to trial.

The victim's father, Daniel Kibodeaux, read the letter to the court. In it, Defendant talked about his family, his job, and his military experience. He described how Mr. Murillo's actions put him on the defensive and made him concerned for his family. When the victim arrived, Defendant thought Mr. Murillo had returned. Defendant admitted he grabbed a .22 semi-automatic gun and raised it to the driver's side of the victim's truck. Defendant said he immediately realized the victim was not Mr. Murillo, and he immediately lowered the gun. The letter further described the impact these charges had on the lives of Defendant and his family, and it expressed his desire to clarify the events of that night. Defendant asked for forgiveness from "the boys and their parents[.]"

33

Although Defendant's brief claims Defendant wrote the letter "during the plea negotiation process at the direction of the prosecutor[,]" nothing in the record supports that allegation. Defendant argues he "relied in good faith on the assurances that anything said or done as a part of the negotiations would not be admissible at trial or, by extension, considered by the court during the sentencing phase." He states he "did not consent to the use or dissemination of this statement to others for any purpose other than for the specific purpose it was intended for during the negotiations."

Nevertheless, Defendant spoke to the court during the sentencing hearing, and he never mentioned any such reliance about the letter not being introduced. Nothing in the record supports Defendant's contention that the letter was written and given to the victim and/or his parents for the sole purpose of plea negotiations. Even though Defendant's counsel stated an objection to the use of the letter at the sentencing hearing, he gave no reason or support for the objection.

Louisiana Code of Evidence Article 410(A)(4) provides a "statement made in the course of plea discussions . . . which do not result in a plea of guilty or which result in a plea of guilty later withdrawn or set aside" is not admissible in any criminal proceeding. The letter would fall under this article if the record supported Defendant's contention that it was written during the course of plea discussions. However, only the unsupported representation of Defendant's appellate counsel's brief links the letter to the victim to a purported attempt at a plea bargain. The record shows only that Defendant wrote the letter prior to trial on some unknown date. Because the record fails to show a relationship between the letter and any plea negotiations, the trial court did not err in allowing it into evidence at the sentencing hearing.

34

Defendant contends the trial court failed to fully consider the relevant sentencing criteria of La.Code Crim.P. art. 894.1, especially the mitigating factors. He further argues his sentence is constitutionally excessive.

Defendant complains the trial court failed to consider he is the sole support for his family, his children are pre-school age, and he has the support of family and friends. The trial court considered Defendant was a thirty-three-year-old high school graduate who served in the U.S. Army for four years and was honorably discharged after serving overseas. He was employed as a project coordinator and was married with two children aged four and three. He had been diagnosed with post-traumatic stress disorder (PTSD) and had made appointments with the Veterans Administration pertaining to therapy and anger management.[6] Defendant's presentencing investigation report showed he had no juvenile criminal history, and this was his first felony conviction. The report did show a misdemeanor conviction for "obstruction/interference of staff, faculty, or students in West Feliciana Parish in 2004" that resulted in two years of misdemeanor probation. The report further showed a warranted search of Defendant's truck after this incident produced marijuana and a smoking pipe.

The trial judge found Defendant's "condolences to the family [of the victim] to be very weak." He thought Defendant was "more concerned about [himself] than the victim[.]" He sentenced Defendant to two years in the parish jail with all but one year suspended and two years of probation with special conditions. The trial judge further ordered "that there be no contact with . . . the three gentlemen and/or their family during the period of probation." Defendant objected to the sentence imposed.

_____

[6]The trial court ordered Defendant to attend and complete an anger management course as part of his sentence.

Defendant also alleges the sentence imposed is unconstitutionally excessive. This court has previously discussed the standard for reviewing excessive sentence claims:

> [Louisiana Constitution Article] I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.

*State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331 (citations omitted) (second alteration in original).

Defendant was exposed to a sentence of up to five years, with or without hard labor, and/or a fine of up to $5,000. La.R.S. 14:27, 14:37.4. Thus, he received a sentence toward the lower end of the possible term and no monetary fine.

Even though a penalty falls within the statutory sentencing range, it may still be unconstitutionally excessive:

> In deciding whether a sentence is shocking or makes no meaningful contribution to acceptable penal goals, an appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case."

*State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061 (citations omitted). "While the trial judge need not articulate every aggravating and mitigating circumstance outlined in art. 894.1, the record must reflect that he adequately considered these guidelines in particularizing the sentence to the defendant." *State v. Smith*, 433 So.2d 688, 698 (La.1983) (citing *State v. Ray*, 423 So.2d 1116 (La.1982); *State v. Keeney*, 422 So.2d 1144 (La.1982); *State v. Duncan*, 420 So.2d 1105 (La.1982)).

"The appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed." La.Code Crim.P. art. 881.4(D). The trial judge's failure to comply with Article 894.1 does not render a sentence invalid:

> The goal of this article is articulation of the factual basis for a sentence, "not rigid or mechanical compliance with its provisions." *State v. Lanclos,* 419 So.2d 475, 478 (La.1982). Accordingly, if "the record clearly shows an adequate factual basis for the sentence imposed[,] remand is unnecessary, even where there has not been full compliance with Article 894.1." *Id.*

*State v. H.A., Sr.*, 10-95, pp. 25-26 (La.App. 3 Cir. 10/6/10), 47 So.3d 34, 50 (alterations in original).

Most of the cases this court has found wherein a defendant was convicted and sentenced to attempted aggravated assault with a firearm involve other counts on which the defendants were convicted and sentenced for additional crimes. *See State v. Murphy*, 19-306 (La.App. 3 Cir. 11/6/19) (unpublished opinion)[7]; *State v. Roberts*, 18-832 (La.App. 3 Cir. 5/1/19), 270 So.3d 747; *State v. Martin*, 17-1100 (La.App. 1 Cir. 2/27/18), 243 So.3d 56, *writ denied,* 18-568 (La. 3/6/19), 266 So.3d 901. However, in *State v. Brown*, 17-124 (La.App. 4 Cir. 12/12/17), 234 So.3d 978, *writ denied,* 18-10 (La. 6/15/18), 257 So.3d 678, the defendant was convicted solely of

---

[7]The Westlaw citation is 2019 WL 5782044.

aggravated assault with a firearm.  He had tendered a check to the victim that was refused for insufficient funds.  When the victim spotted the defendant's vehicle, he followed it and stopped when the defendant's vehicle stopped.  A verbal confrontation ensued.  The defendant pulled a gun on the victim, placed it against his side, and told the victim he had killed two or three people.

The defendant was a first felony offender.  He was the father of young children and had "significant ties to the community." *Id.* at 983.  He did not discharge the weapon, and no injuries resulted.  The fourth circuit affirmed the trial court's imposition of the maximum fine of $10,000 and the mid-range sentence of five years at hard labor.

Here, the minor victim feared for his life after Defendant pointed a gun in his face without the victim's provocation.  The jury could have reasonably found Defendant intentionally placed the victim in reasonable apprehension of receiving a battery and found him guilty of aggravated assault with a firearm rather than the attempted offense.  Such a finding would have subjected Defendant to a sentence of twice the maximum term and twice the maximum fine as the attempted offense.  Even though Defendant and the *Brown* defendant were convicted of different crimes, their behavior in their situations was very similar.

In *State v. Sibley*, 09-1104 (La.App. 3 Cir. 6/2/10), 41 So.3d 581, the defendant was convicted of attempted first degree murder and armed robbery and sentenced to two concurrent thirty-year terms at hard labor.  On appeal, he contended the trial court failed to consider the mitigating factor that he had a severe mental illness, even though he submitted medical records showing diagnoses of schizoaffective disorder, PTSD, and marijuana and alcohol abuse.  The defendant had served in the military in Iraq and had been having problems, including a suicide

attempt, since his return. Expert testimony showed his psychiatric disorders likely were major contributing factors to the behavior that led to his arrest.

In sentencing the defendant, the trial court noted his military service but said it had "to balance that against protecting the community." *Id.* at 584. On appeal, the defendant argued his sentences were excessive "because the trial court did not specify his mental illness as a mitigating factor." *Id.* at 585.

This court noted the defendant's sentences were not only within the statutory range but also well below the maximum sentences he could have received. The State also dropped five additional charges against the defendant as part of his plea agreement. This court found those factors "indicate[d] the trial court gave significant weight to the mitigating factors of the case." *Id.* at 586. This court also noted, "When the facts in the record clearly support the sentencing choice, there is 'little justification for a remand for resentencing when the record so plainly supports the sentence imposed.'" *Id.* (citing *State v. Day,* 391 So.2d 1147, 1151 (La.1980)).

This court affirmed the defendant's sentences, finding the facts supported the sentences and finding "no merit to the defendant's contention that the trial court failed to consider mitigating evidence." *Id.* at 587.

In *Lafleur*, 209 So.3d 927, the defendant was convicted of aggravated assault with a firearm and sentenced to the maximum term of ten years at hard labor. On appeal, he argued the trial court failed to consider his mental illness as a mitigating factor. He claimed he had been diagnosed with schizophrenia and paranoia and was non-compliant with his medication at the time of the incident. This court found nothing in the court record indicated the trial court considered the defendant's mental illness when imposing his sentence.

However, this case is distinguishable from *Lafleur*, 209 So.3d 927. At trial, Defendant did not argue his PTSD or any other type of mental illness was a factor in his behavior that night. The record reflects the trial court considered the applicable factors of La.Code Crim.P. art. 894.1 and Defendant's mitigating circumstances. The record further provides an adequate factual basis to support the sentence imposed. Defendant will serve one year in the parish jail, not at hard labor, serve two years on probation, and pay no fine for a serious crime. The trial court correctly considered the evidence and imposed a sentence that is not excessive.

## CONCLUSION

This court hereby affirms Defendant's conviction and sentence.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2-16.3.